AMALGAMATED ASSOCIATION OF STREET,
ELECTRIC RAILWAY & MOTOR COACH
EMPLOYEES OF AMERICA ET AL.
*v.* LOCKRIDGE

No. 76.   Argued December 15, 1970—Decided June 14, 1971

HARLAN, J., delivered the opinion of the Court, in which BLACK, BRENNAN, STEWART, and MARSHALL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 302. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 309. BLACKMUN, J., filed a dissenting statement, *post*, p. 332.

*Isaac N. Groner* argued the cause for petitioners. With him on the briefs were *Earle W. Putnam* and *Paul T. Bailey.*

*John L. Kilcullen* argued the cause for respondent. With him on the brief were *Robert W. Green* and *Samuel Kaufman.*

Briefs of *amici curiae* urging reversal were filed by *Solicitor General Griswold, Arnold Ordman, Dominick L. Manoli, Norton J. Come,* and *Linda Sher* for the National Labor Relations Board, and by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations.

*Jonathan C. Gibson* filed a brief for the National Right to Work Legal Defense and Education Foundation as *amicus curiae* urging affirmance.

MR. JUSTICE HARLAN delivered the opinion of the Court.

*San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), established the general principle that the National Labor Relations Act pre-empts state and federal court jurisdiction to remedy conduct that is arguably protected or prohibited by the Act. That decision represents the watershed in this Court's continuing effort to mark the extent to which the maintenance of a general federal law of labor relations combined with a centralized administrative agency to implement its provisions necessarily supplants the operation of the more traditional legal processes in this field. We granted certiorari in

this case, 397 U. S. 1006 (1970), because the divided decision of the Idaho Supreme Court demonstrated the need for this Court to provide a fuller explication of the premises upon which *Garmon* rests and to consider the extent to which that decision must be taken to have modified or superseded this Court's earlier efforts to treat with the knotty pre-emption problem.

## I

Respondent, Wilson P. Lockridge, has obtained in the Idaho courts a judgment for $32,678.56 against petitioners, Northwest Division 1055 of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America and its parent international association,[1] on the grounds that, in procuring Lockridge's discharge from employment, pursuant to a valid union security clause in the applicable collective-bargaining agreement, the Union breached a contractual obligation embodied in the Union's constitution and bylaws.

From May 1943 until November 2, 1959, Lockridge was a member of petitioner Union and employed within the State of Idaho as a bus driver for Western Greyhound Lines, or its predecessor. At the time of Lockridge's dismissal from the Union, § 3 (a) of the collective-bargaining agreement in effect between the Union and Greyhound provided:

"All present employees covered by this contract shall become members of the ASSOCIATION [Union] not later than thirty (30) days following

---

[1] The local and its parent are, of course, separate legal entities for many purposes and were joined as codefendants below so that each appears as a petitioner in this Court. However both will be jointly described throughout this opinion as "the petitioner" or "the Union" since the parent was held liable on the theory that it was responsible for the acts of the local here involved, not on the basis of any separate acts committed only by the parent.

its effective date and shall remain members as a condition precedent to continued employment. This section shall apply to newly hired employees thirty (30) days from the date of their employment with the COMPANY." App. 88.

In addition, § 91 of the Union's Constitution and General Laws provided, in pertinent part, that:

"All dues . . . of the members of this Association are due and payable on the first day of each month for that month . . . . They must be paid by the fifteenth of the month in order to continue the member in good standing. . . . A member in arrears for his dues . . . after the fifteenth day of the month is not in good standing . . . and where a member allows his arrearage . . . to run into the second month before paying the same, he shall be debarred from benefits for one month after payment. Where a member allows his arrearage . . . to run over the last day of the second month without payment, he does thereby suspend himself from membership in this Association. . . . Where agreements with employing companies provide that members must be in continuous good financial standing, the member in arrears one month may be suspended from membership and removed from employment, in compliance with the terms of the agreement." App. 91–92.

Prior to September 1959, Lockridge's dues had been deducted from his paycheck by Greyhound, pursuant to a checkoff arrangement. During that year, however, Lockridge and a few other employees were released at their request from the checkoff, and thereby became obligated to pay their dues directly to the Union's office in Portland, Oregon. On November 2, 1959, C. A. Bankhead, the treasurer and financial secretary of the union local, suspended Lockridge from membership on the sole ground that since respondent had not yet paid his October

dues he was therefore in arrears contrary to § 91. Bankhead simultaneously notified Greyhound of this determination and requested that Lockridge be removed from employment. Greyhound promptly complied. Lockridge's wife received notice of the suspension from membership in early November, while her husband was on vacation, and on November 10, 1959, tendered Bankhead a check to cover respondent's dues for October and November, which Bankhead refused to accept.

This chain of events, combined with the disparity between the above-quoted terms of the collective-bargaining agreement and the union constitution and general laws, generated this lawsuit. Lockridge has contended, and the Idaho courts have so held, that because he was less than two months behind in his payment of dues, respondent had not yet "suspended himself from membership" within the meaning of the Union's rules, but instead had merely ceased to be a "member in good standing." And, because the collective-bargaining agreement required only that employees "remain members," those courts held that neither that agreement nor the final sentence of § 91 justified the Union's action in procuring Lockridge's discharge. Therefore, the Idaho courts have held, Lockridge's dismissal violated a promise, implied in law, that the Union would not seek termination of his employment unless he was sufficiently derelict in his dues payments to subject him to loss of his job under the terms of the applicable collective-bargaining agreement.

Although the trial court made no formal findings of fact on this score,[2] it appears likely that the Union pro-

---

[2] Because the Idaho courts treated as irrelevant the actual motivation for the Union's conduct, see Part III, *infra*, the trial court did not incorporate in its formal findings of fact and conclusions of law any reference to this checkoff dispute. However, some such evidence was allowed at trial, as well as testimony about the Union's past

cured Lockridge's dismissal in the mistaken belief that the applicable union security agreement with Greyhound did, in fact, require employees to remain members in good standing and that the Union insisted on what it thought was a technically valid position because it was piqued by Lockridge's obtaining his release from the checkoff. The trial court did find specifically that "almost without exception" it had been the past practice of this local division of the Union merely to suspend delinquent members from service, rather than to strip them of membership, and to put them back to work without loss of seniority when their dues were paid.

Lockridge initially made some efforts, with Bankhead's assistance, to obtain reinstatement in the Union but these proved unsuccessful. No charges were filed before the National Labor Relations Board.[3] Instead, Lockridge

---

practice regarding dues-delinquent members, on the theory that this might ultimately bear on the issue whether Lockridge had properly exhausted his administrative remedies. The trial judge in his initial memorandum decision, however, did indicate his belief that "the true facts are" as stated in the text accompanying this footnote.

[3] It appears that at least one other person, Elmer Day, was similarly suspended from membership in the Union and discharged from Greyhound. On November 12, 1959, he filed a formal charge with the Board's Regional Director. On December 15, 1959, the Director advised Day, by letter, that "it appears that, because there is insufficient evidence of violations, further proceedings are not warranted at this time. I am therefore refusing to issue Complaint in these matters." The Director further informed Day that "you may obtain a review of this action by filing a request for such review with the General Counsel of the National Labor Relations Board . . . ." Day did not seek review. Instead, he filed suit against the Union in the Circuit Court of Multnomah County, Oregon, for tortious interference with employment, and obtained a jury award for general and punitive damages. On appeal, the Supreme Court of Oregon (two judges dissenting) reversed, holding the conduct complained of to be within the Board's exclusive jurisdiction. *Day* v. *Northwest Division 1055*, 238 Ore. 624, 389 P. 2d 42 (1964). (Some of these facts are taken from the dissenting opinion in that case.)

filed suit in September 1960 in the Idaho State District Court against the Union and Greyhound, which was later dropped as a party. That court, on the Union's motion, dismissed the complaint in April 1961 on the grounds that it charged the Union with the commission of an unfair labor practice and consequently fell within the exclusive jurisdiction of the NLRB. A year later, the Idaho Supreme Court reversed, holding that the state courts had jurisdiction under this Court's decision in *Machinists* v. *Gonzales,* 356 U. S. 617 (1958), and remanded for trial on the merits. *Lockridge* v. *Amalgamated Assn. of St., El. Ry. & M. C. Emp.,* 84 Idaho 201, 369 P. 2d 1006 (1962).

In 1965 Lockridge filed a second amended complaint which has since served as the basis for this lawsuit. Its first count alleged that

> "in suspending plaintiff from membership in the [Union] which resulted in plaintiff's loss of employment, the [Union] . . . acted wantonly, wilfully and wrongfully and without just cause, and . . . deprived plaintiff of his . . . employment with Greyhound Corporation that accrued to him and would accrue to him by reason of his employment, seniority and experience, and plaintiff has been harassed and subject to mental anguish . . . ." App. 46–47.

Count Two, sounding squarely in contract, alleged that

> "in wrongfully suspending plaintiff from membership in the [Union], which resulted in plaintiff's discharge from employment with the Greyhound Corporation, the [Union] . . . acted wrongfully, wantonly, wilfully and maliciously and without just cause and violated the constitution and general laws of the [Union] which constituted a contract between the plaintiff as a member thereof and the [Union], and as a result of said breach of contract plaintiff has been deprived of his . . . employment with . . :

Greyhound Corporation . . . and plaintiff has been embarrassed and subjected to mental anguish . . . ." App. 48.

The complaint sought damages in the amount of $212,000 "and such other and further relief as to the court may appear meet and equitable in the premises." *Ibid.*

After trial, the Idaho District Court found the facts as stated above and held that they did, indeed, amount to a breach of contract. The court felt itself bound by the prior determination of the Idaho Supreme Court to consider that it might properly exercise jurisdiction .over the controversy and to "decide [the] case on the theories of" *Machinists* v. *Gonzales, supra.* Consequently, the trial judge concluded that Lockridge was entitled to a decree restoring him to membership in the Union, "although plaintiff has never sought such remedy." Lockridge was also awarded $32,678.56 as compensation for wages actually lost due to his dismissal from Greyhound's employ, but his requests for future damages arising from continued loss of employment, compensation for loss of. seniority or fringe benefits, and punitive damages were all denied. On appeal the Idaho Supreme Court affirmed, over one dissenting vote, except that it also ordered restoration of respondent's seniority rights. 93 Idaho 294, 460 P. 2d 719 (1969). Having granted certiorari for the reasons stated at the outset of this opinion, we now reverse.

## II

### A.

On the surface, this might appear to be a routine and simple case. Section 8 (b)(2) of the National Labor Relations Act, as amended, 61 Stat. 141, 29 U. S. C. § 158 (b)(2), makes it an unfair labor practice for a union

"to cause or attempt to cause an employer to dis-

criminate against an employee in violation of sub-section (a)(3) . . . or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

Section 8 (b)(1)(A), 29 U. S. C. § 158 (b)(1)(A), makes it an unfair labor practice for a union "to restrain or coerce . . . employees in the exercise of the rights guaranteed in section 7," which includes the right not only "to form, join, or assist labor organizations" but also "the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)." 61 Stat. 140, 29 U. S. C. § 157. Section 8 (a)(3) makes it an unfair labor practice for an employer

"by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act . . . shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . : *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization . . . if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly re-

quired as a condition of acquiring or retaining membership . . . ." 29 U. S. C. § 158 (a)(3).

Further, in *San Diego Building Trades Council* v. *Garmon,* 359 U. S., at 245, we held that the National Labor Relations Act pre-empts the jurisdiction of state and federal courts to regulate conduct "arguably subject to § 7 or § 8 of the Act." On their face, the above-quoted provisions of the Act at least arguably either permit or forbid the union conduct dealt with by the judgment below. For the evident thrust of this aspect of the federal statutory scheme is to permit the enforcement of union security clauses, by dismissal from employment, only for failure to pay dues. Whatever other sanctions may be employed to exact compliance with those internal union rules unrelated to dues payment, the Act seems generally to exclude dismissal from employment. See *Radio Officers' Union* v. *NLRB,* 347 U. S. 17 (1954). Indeed, in the course of rejecting petitioner's pre-emption argument, the Idaho Supreme Court stated that, in its opinion, the Union "did most certainly violate 8 (b)(1)(A), did most certainly violate 8 (b)(2) . . . and probably caused the employer to violate 8 (a)(3)." 93 Idaho, at 299, 460 P. 2d, at 724. Thus, given the broad pre-emption principle enunciated in *Garmon,* the want of state court power to resolve Lockridge's complaint might well seem to follow as a matter of course.

The Idaho Supreme Court, however, concluded that it nevertheless possessed jurisdiction in these circumstances. That determination, as we understand it, rested upon three separate propositions, all of which are urged here by respondent. The first is that the Union's conduct was not only an unfair labor practice, but a breach of its contract with Lockridge as well. "Pre-emption is not established simply by showing that the same facts will sustain two different legal wrongs." 93 Idaho, at 300,

460 P. 2d, at 725. In other words *Garmon,* the state court and respondent assert, states a principle applicable only where the state law invoked is designed specifically to regulate labor relations; it has no force where the State applies its general common law of contracts to resolve disputes between a union and its members. Secondly, it is urged that the facts that might be shown to vindicate Lockridge's claim in the Idaho state courts differ from those relevant to proceedings governed by the National Labor Relations Act. It is said that the conduct regulated by the Act is union and employer discrimination; general contract law takes into account only the correctness of competing interpretations of the language embodied in agreements. 93 Idaho, at 303–304, 460 P. 2d, at 728–729. Finally, there recurs throughout the state court opinion, and the arguments of respondent here, the theme that the facts of the instant case render it virtually indistinguishable from *Machinists* v. *Gonzales,* 356 U. S. 617 (1958), where this Court upheld the exercise of state court jurisdiction in an opinion written only one Term prior to *Garmon,* by the author of *Garmon* and which was approvingly cited in the *Garmon* opinion itself.

We do not believe that any of these arguments suffice to overcome the plain purport of *Garmon* as applied to the facts of this case. However, we have determined to treat these considerations at some length because of the understandable confusion, perhaps in a measure attributable to the previous opinions of this Court, they reflect over the jurisprudential bases upon which the *Garmon* doctrine rests.

## B

The constitutional principles of pre-emption, in whatever particular field of law they operate, are designed with a common end in view: to avoid conflicting regulation of conduct by various official bodies which might

have some authority over the subject matter. A full understanding of the particular pre-emption rule set forth in *Garmon* especially requires, we think, appreciation of the precise nature and extent of the potential for injurious conflict that would inhere in a system unaffected by such a doctrine, and also the setting in which the general problem of accommodating conflicting claims of competence to resolve disputes touching upon labor relations has been presented to this Court.

The course of events that eventuated in the enactment of a comprehensive national labor law, entrusted for its administration and development to a centralized, expert agency, as well as the very fact of that enactment itself, reveals that a primary factor in this development was the perceived incapacity of common-law courts and state legislatures, acting alone, to provide an informed and coherent basis for stabilizing labor relations conflict and for equitably and delicately structuring the balance of power among competing forces so as to further the common good.[4] The principle of pre-emption that informs our general national labor law was born of this Court's efforts, without the aid of explicit congressional guidance, to delimit state and federal judicial authority over labor disputes in order to preclude, so far as reasonably possible, conflict between the exertion of judicial and administrative power in the attainment of the multi-faceted policies underlying the federal scheme.

As it appears to us, nothing could serve more fully to defeat the congressional goals underlying the Act than to subject, without limitation, the relationships it seeks to create to the concurrent jurisdiction of state and federal courts free to apply the general local law. Nor

---

[4] For a discussion of these problems that formed a backdrop for the federal act, see H. Wellington, Labor and the Legal Process, c. 1 (1968). See also Cox, Federalism in the Law of Labor Relations, 67 Harv. L. Rev. 1297, 1302–1304, 1315–1317 (1954).

would an approach suffice that sought merely to avoid disparity in the content of proscriptive behavioral rules. As the Court observed in *Garner* v. *Teamsters Union,* 346 U. S. 485, 490–491 (1953), Congress in establishing overriding federal supervision of labor law

"did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision . . . . Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. . . . A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law."

Conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy. As the passage from *Garner* indicates, in matters of dispute concerning labor relations a simple recitation of the formally prescribed rights and duties of the parties constitutes an inadequate description of the actual process for settlement Congress has provided. The technique of administration and the range and nature of those remedies that are and are not available is a fundamental part and parcel of the operative legal system established by the National Labor Relations Act. "Administration is more than a means of regulation; administration is regulation. We have been concerned with conflict in its

broadest sense; conflict with a complex and interrelated federal scheme of law, remedy, and administration." *Garmon,* 359 U. S., at 243.

The rationale for pre-emption, then, rests in large measure upon our determination that when it set down a federal labor policy Congress plainly meant to do more than simply to alter the then-prevailing substantive law. It sought as well to restructure fundamentally the processes for effectuating that policy, deliberately placing the responsibility for applying and developing this comprehensive legal system in the hands of an expert administrative body rather than the federalized judicial system.[5]  Thus, that a local court, while adjudicating a

---

[5] This appears to be the precise point of difference between our assessment of congressional purpose and that of MR. JUSTICE WHITE. While it is not clear how he would treat the *Garmon* principle where the conflict is between unions and employers, he expressly argues that state power to regulate union conduct harmful to its members that is within the compass of the National Labor Relations Act should be unlimited, except by the obvious qualification that States may not punish conduct affirmatively protected by federal law. Thus, in his view, when it enacted the NLRA, Congress would have fully served those interests it intended to promote in the conduct of union-member relations had it simply declared that the States may not proscribe certain, defined conduct. Certainly, he is prepared to adopt a judicial construction of the Act that is consistent only with such a view of congressional intent. At bottom, what his position seems to imply is that giving the National Labor Relations Board jurisdiction to enforce federal law regulating the use of union security clauses was largely, if not wholly, without rational purpose. As we have explained at some length above, we do not understand how courts may properly take such a limited view of congressional intent in the face of legislation that is in fact much more wide ranging, and in the absence of a contrary expression of intention from Congress itself.

Further, MR. JUSTICE WHITE apparently regards the remedial aspects of the federal scheme as unimportant to those who designed it. For example, assuming arguendo that petitioner's conduct was prohibited under both federal and state law, he would deem it of no

labor dispute also within the jurisdiction of the NLRB, may purport to apply legal rules identical to those pre-scribed in the federal Act or may eschew the authority to define or apply principles specifically developed to regulate labor relations does not mean that all relevant potential for debilitating conflict is absent.

A second factor that has played an important role in our shaping of the pre-emption doctrine has been the necessity to act without specific congressional direction. The precise extent to which state law must be displaced to achieve those unifying ends sought by the national legislature has never been determined by the Congress. This has, quite frankly, left the Court with few available options. We cannot declare pre-empted all local regula-tion that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States. Nor can we proceed on a case-by-case basis to determine whether each particular final judicial pronouncement does, or might reasonably be thought to, conflict in some relevant manner with federal labor policy. This Court

national significance if one State punished such conduct with a jail sentence, and another utilized punitive damages, while the NLRB merely awarded back pay. His position apparently is that Congress considered any state tribunal equally capable, with the Board, of assessing the appropriateness of a given remedy and was unconcerned about disparities in the reactions of the States to unlawful union behavior. This argument, too, seems incompatible with the simple fact that Congress committed enforcement of the federal law here involved to a centralized agency.

For these reasons, MR. JUSTICE WHITE's analogies do not persuade us. Unlike the problem here under review, Congress did not put enforcement of the Labor-Management Reporting and Disclosure Act of 1959 into the hands of the Board. 73 Stat. 519. And it affirmatively expressed an intention that the Board not possess pre-emptive jurisdiction over suits to enforce collective bargaining agree-ments. See Part III, *infra*.

is ill-equipped to play such a role and the federal system dictates that this problem be solved with a rule capable of relatively easy application, so that lower courts may largely police themselves in this regard. Equally important, such a principle would fail to take account of the fact, as discussed above, that simple congruity of legal rules does not, in this area, prove the absence of untenable conflict. Further, it is surely not possible for this Court to treat the National Labor Relations Act section by section, committing enforcement of some of its provisions wholly to the NLRB and others to the concurrent domain of local law. Nothing in the language or underlying purposes of the Act suggests any basis for such distinctions. Finally, treating differently judicial power to deal with conduct protected by the Act from that prohibited by it would likewise be unsatisfactory.[6] Both areas equally involve conduct whose legality is governed by federal law, the application of which Congress committed to the Board, not courts.

This is not to say, however, that these inherent limitations on this Court's ability to state a workable rule that comports reasonably with apparent congressional objectives are necessarily self-evident. In fact, varying approaches were taken by the Court in initially grappling with this pre-emption problem. Thus, for example, some early cases suggested the true distinction lay between judicial application of general common law, which was permissible, as opposed to state rules specifically designed to regulate labor relations, which were pre-empted. See,

---

[6] The objections raised to this latter point, *post,* at 325–332 (WHITE, J.; dissenting), seem largely irrelevant to the case under review. This is not a situation where the sole argument for pre-emption is that the union's conduct was arguably protected. Clearly, if the facts are as respondent believes them to be, there is ample reason to conclude that petitioner probably committed an unfair labor practice.

*e. g., Automobile Workers* v. *Russell,* 356 U. S. 634, 645
(1958). Others made pre-emption turn on whether the
States purported to apply a remedy not provided for by
the federal scheme, *e. g., Weber* v. *Anheuser-Busch, Inc.,*
348 U. S. 468, 479–480 (1955), while in still others the
Court undertook a thorough scrutiny of the federal Act
to ascertain whether the state courts had, in fact, arrived
at conclusions inconsistent with its provisions, *e. g., Auto-
mobile Workers* v. *Wisconsin Employment Relations Bd.,*
336 U. S. 245 (1949). For the reasons outlined above
none of these approaches proved satisfactory, however,
and each was ultimately abandoned. It was, in short,
experience—not pure logic—which initially taught that
each of these methods sacrificed important federal inter-
ests in a uniform law of labor relations centrally adminis-
tered by an expert agency without yielding anything in
return by way of predictability or ease of judicial
application.

The failure of alternative analyses and the interplay
of the foregoing policy considerations, then, led this
Court to hold in *Garmon,* 359 U. S., at 244:

> "When it is clear or may fairly be assumed that
> the activities which a State purports to regulate are
> protected by § 7 of the National Labor Relations Act,
> or constitute an unfair labor practice under § 8, due
> regard for the federal enactment requires that state
> jurisdiction must yield. To leave the States free
> to regulate conduct so plainly within the central aim
> of federal regulation involves too great a danger of
> conflict between power asserted by Congress and
> requirements imposed by state law."

## C

Upon these premises, we think that *Garmon* rather
clearly dictates reversal of the judgment below. None
of the propositions asserted to support that judgment

can withstand an application, in light of those factors that compelled its promulgation, of the *Garmon* rule.

Assuredly the proposition that Lockridge's complaint was not subject to the exclusive jurisdiction of the NLRB because it charged a breach of contract rather than an unfair labor practice is not tenable. Pre-emption, as shown above, is designed to shield the system from conflicting regulation of conduct. It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern. Indeed, the notion that a relevant distinction exists for such purposes between particularized and generalized labor law was explicitly rejected in *Garmon* itself. 359 U. S., at 244.

The second argument, closely related to the first, is that the state courts, in resolving this controversy, did deal with different conduct, *i. e.,* interpretation of contractual terms, than would the NLRB which would be required to decide whether the Union discriminated against Lockridge. At bottom, of course, the Union's action in procuring Lockridge's dismissal from employment is the conduct which Idaho courts have sought to regulate. Thus, this second point demonstrates at best that Idaho defines differently what sorts of such union conduct may permissibly be proscribed. This is to say either that the regulatory schemes, state and federal, conflict (in which case pre-emption is clearly called for) or that Idaho is dealing with conduct to which the federal Act does not speak. If the latter assertion was intended, it is not accurate. As pointed out in Part II–A, *supra,* the relevant portions of the Act operate to prohibit a union from causing or attempting to cause an employer to discriminate against an employee because his membership in the union has been terminated "on some ground other than" his failure to pay those dues requisite to member-

ship. This has led the Board routinely and frequently to inquire into the proper construction of union regulations in order to ascertain whether the union properly found an employee to have been derelict in his dues-paying responsibilities, where his discharge was procured on the asserted grounds of nonmembership in the union. See, e. g., *NLRB* v. *Allied Independent Union,* 238 F. 2d 120 (CA7 1956); *NLRB* v. *Leece-Neville Co.,* 330 F. 2d 242 (CA6 1964); *Communications Workers* v. *NLRB,* 215 F. 2d 835 (CA2 1954); *NLRB* v. *Spector Freight System, Inc.,* 273 F. 2d 272 (CA8 1960). See generally 3 CCH Lab. L. Rep. ¶ 4525 (Labor Relations). That a union may in good faith have misconstrued its own rules has not been treated by the Board as a defense to a claimed violation of § 8 (b)(2). In the Board's view, it is the fact of misapplication by a union of its rules, not the motivation for that discrimination, that constitutes an unfair labor practice. See, in addition to the authorities cited above, *Electrical, Radio & Machine Workers* v. *NLRB,* 113 U. S. App. D. C. 342, 347, 307 F. 2d 679, 684 (1962), and *Teamsters Local* v. *NLRB,* 365 U. S. 667, 681 (1961) (concurring opinion).

From the foregoing, then, it would seem that this case indeed represents one of the clearest instances where the *Garmon* principle, properly understood, should operate to oust state court jurisdiction. There being no doubt that the conduct here involved was arguably protected by § 7 or prohibited by § 8 of the Act, the full range of very substantial interests the pre-emption doctrine seeks to protect is directly implicated here.

However, a final strand of analysis underlies the opinion of the Idaho Supreme Court, and the position of respondent, in this case. Our decision in *Machinists* v. *Gonzales,* 356 U. S. 617 (1958), it is argued, fully survived the subsequent reorientation of pre-emption doc-

trine effected by the *Garmon* decision, providing, in effect, an express exception for the exercise of judicial jurisdiction in cases such as this.

The fact situation in *Gonzales* does resemble in some relevant regards that of the instant case. There the California courts had entertained a complaint by an individual union member claiming he had been expelled from his union in violation of rights conferred upon him by the union's constitution and bylaws, which allegedly constituted a contract between him and his union. Gonzales prevailed on his breach-of-contract theory and was awarded damages for wages lost due to the revocation of membership as well as a decree providing for his reinstatement in the union. This Court confirmed the California courts' power to award the monetary damages, the only aspect of the action below challenged in this Court. The primary rationale for the result reached was that California should be competent to "fill out," 356 U. S., at 620, the reinstatement remedy by utilizing "the comprehensive relief of equity," *id.*, at 621, which the Board did not fully possess. Secondarily, it was said that the lawsuit "did not purport to remedy or regulate union conduct on the ground that it was designed to bring about employer discrimination against an employee, the evil the Board is concerned to strike at as an unfair labor practice under § 8 (b)(2)." *Id.*, at 622.

Although it was decided only one Term subsequent to *Gonzales, Garmon* clearly did not fully embrace the technique of the prior case. It was precisely the realization that disparities in remedies and administration could produce substantial conflict, in the practical sense of the term, between the relevant state and federal regulatory schemes and that this Court could not effectively and responsibly superintend on a case-by-case basis the exertion of state power over matters arguably governed by the National Labor Relations Act that impelled the some-

what broader formulation of the pre-emption doctrine in *Garmon.* It seems evident that the full-blown rationale of *Gonzales* could not survive the rule of *Garmon.* Nevertheless, *Garmon* did not cast doubt upon the result reached in *Gonzales,* but cited it approvingly as an example of the fact that state court jurisdiction is not preempted "where the activity regulated was a merely peripheral concern of the . . . Act." 359 U. S., at 243.

Against this background, we attempted to define more precisely the reach of *Gonzales* within the more comprehensive framework *Garmon* provided in the companion cases of *Plumbers' Union* v. *Borden,* 373 U. S. 690 (1963), and *Iron Workers* v. *Perko,* 373 U. S. 701 (1963).

Borden had sued his union in state courts, alleging that the union had arbitrarily refused to refer him to a particular job which he had lined up. He recovered damages, based on lost wages, on the grounds that this conduct constituted both tortious interference with his right to contract for employment and a breach of promise, implicit in his membership arrangement with the union, not to discriminate unfairly against any member or deny him the right to work. Perko had obtained a large money judgment in the Ohio courts on proof that the union had conspired, without cause, to deprive him of employment as a foreman by demanding his discharge from one such position he had held and representing to others that his foreman's rights had been suspended. We held both Perko's and Borden's judgments inconsistent with the *Garmon* rule essentially for the same reasons we have concluded that Lockridge could not, consistently with the *Garmon* decision, maintain his lawsuit in the state courts. We further held there was no necessity to "consider the present vitality of [the *Gonzales*] rationale in the light of more recent decisions," because in those cases, unlike *Gonzales,* "the crux of the action[s] . . . concerned alleged interference with the plaintiff's exist-

ing or prospective employment relations and was not directed to internal union matters." Because no specific claim for restoration of membership rights had been advanced, "there was no permissible state remedy to which the award of consequential damages for loss of earnings might be subordinated." *Perko,* 373 U. S., at 705. See also *Borden,* 373 U. S., at 697.

In sum, what distinguished *Gonzales* from *Borden* and *Perko* was that the former lawsuit "was focused on purely internal union matters," *Borden, supra,* at 697, a subject the National Labor Relations Act leaves principally to other processes of law. The possibility that, in defining the scope of the union's duty to Gonzales, the state courts would directly and consciously implicate principles of federal law was at best tangential and remote. In the instant case, however, this possibility was real and immediate. To assess the legality of his union's conduct toward Gonzales the California courts needed only to focus upon the union's constitution and by-laws. Here, however, Lockridge's entire case turned upon the construction of the applicable union security clause, a matter as to which, as shown above, federal concern is pervasive and its regulation complex. The reasons for Gonzales' deprivation of union membership had nothing to do with matters of employment, while Lockridge's cause of action and claim for damages were based solely upon the procurement of his discharge from employment. It cannot plausibly be argued, in any meaningful sense, that Lockridge's lawsuit "was focused on purely internal union matters." Although nothing said in *Garmon* necessarily suggests that States cannot regulate the general conditions which unions may impose on their membership, it surely makes crystal clear that *Gonzales* does not stand for the proposition that resolution of any union-member conflict is within state competence so long as one of the

remedies provided is restoration of union membership. This much was settled by *Borden* and *Perko,* and it is only upon such an unwarrantably broad interpretation of *Gonzales* that the judgment below could be sustained.

## III

The pre-emption doctrine we apply today is, like any other purposefully administered legal principle, not without exception. Those same considerations that underlie *Garmon.* have led this Court to permit the exercise· of judicial power over conduct arguably protected or prohibited by the Act where Congress has affirmatively indicated that such power should exist, *Smith* v. *Evening News Assn.,* 371 U. S. 195 (1962); *Teamsters Union* v. *Morton,* 377 U. S. 252 (1964), where this Court cannot, in spite of the force of the policies *Garmon* seeks to promote, conscientiously presume that Congress meant to intrude so deeply into areas traditionally left to local· law, *e. g., Linn-*v. *Plant Guard Workers,* 383 U. S. 53 (1966); *Automobile Workers* v. *Russell,* 356 U. S. 634 (1958),[7] and where the particular rule of law sought to be invoked before another tribunal is so structured and administered that, in virtually all instances, it is safe to presume that judicial supervision will not disserve the.

[7] *Garmon* itself recognized that *Russell* permitted state courts "to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order." 359 U. S., at 247. However, whereas the Court in *Russell* had justified that result principally upon the broad grounds that state law not specifically relating to labor relations *per se* was not pre-empted by the Act, the Court in *Garmon* restated this result as dictated .by "the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace [which] is not overridden in the absence of clearly expressed congressional direction." *Ibid.* It is, of course, this .latter and narrower rationale that survives today.

interests promoted by the federal labor statutes; *Vaca* v. *Sipes,* 386 U. S. 171 (1967).[8]

In his brief before this Court, respondent has argued for the first time since this lawsuit was started that two of these exceptions to the *Garmon* principle independently justify the Idaho courts' exercise of jurisdiction over this controversy. First, Lockridge contends that his action, properly viewed, is one to enforce a collective-bargaining agreement. Alternatively, he asserts the suit, in essence, was one to redress petitioner's breach of its duty of fair representation. As will be seen, these contentions are somewhat intertwined.

In § 301 of the Taft-Hartley Act, 61 Stat. 156, Congress authorized federal courts to exercise jurisdiction over suits brought to enforce collective-bargaining agreements. We have held that such actions are judicially cognizable, even where the conduct alleged was arguably protected or prohibited by the National Labor Relations Act because the history of the enactment of § 301 reveals that "Congress deliberately chose to leave the enforcement of collective agreements 'to the usual processes of the law.' " *Charles Dowd Box Co.* v. *Courtney,* 368 U. S. 502, 513 (1962). It is firmly established, further, that state courts retain concurrent jurisdiction to adjudicate such claims, *Charles Dowd Box Co., supra,* and that individual employees have standing to protect rights conferred upon them by such agreements, *Smith* v. *Evening News, supra; Humphrey* v. *Moore,* 375 U. S. 335 (1964).

Our cases also clearly establish that individual union members may sue their employers under § 301 for breach of a promise embedded in the collective-bargaining agree-

---

[8] It may be that a similar exception would arise where the Board affirmatively indicates that, in its view, pre-emption would not be appropriate. Cf. *post,* at 310–312, 319 n. 2 (WHITE, J., dissenting). As the Board's *amicus* brief in the instant case makes clear, no such question is now before us.

ment that was intended to confer a benefit upon the individual. *Smith* v. *Evening News, supra.* Plainly, however, this is not such a lawsuit. Lockridge specifically dropped Greyhound as a named party from his initial complaint and has never reasserted a right to redress from his former employer.

This Court has further held in *Humphrey* v. *Moore, supra,* that § 301 will support, regardless of otherwise applicable pre-emption considerations, a suit in the state courts by a union member against his union that seeks to redress union interference with rights conferred on individual employees by the employer's promises in the collective-bargaining agreement, where it is proved that such interference constituted a breach of the duty of fair representation. Indeed, in *Vaca* v. *Sipes,* 386 U. S. 171 (1967), we held that an action seeking damages for injury inflicted by a breach of a union's duty of fair representation was judicially cognizable in any event, that is, even if the conduct complained of was arguably protected or prohibited by the National Labor Relations Act and whether or not the lawsuit was bottomed on a collective agreement. Perhaps Count One of Lockridge's second amended complaint could be construed to assert either or both of these theories of recovery. However, it is unnecessary to pass upon the extent to which *Garmon* would be inapplicable if it were shown that in these circumstances petitioner not only breached its contractual obligations to respondent, but did so in a manner that constituted a breach of the duty of fair representation. For such a claim to be made out, Lockridge must have proved "arbitrary or bad-faith conduct on the part of the Union." *Vaca* v. *Sipes, supra,* at 193. There must be "substantial evidence of fraud, deceitful action or dishonest conduct." *Humphrey* v. *Moore, supra,* at 348. Whether these requisite elements have been proved is a matter of federal law. Quite

obviously, they were not even asserted to be relevant in the proceedings below. As the Idaho Supreme Court stated in affirming the verdict for Lockridge, "[t]his was a misinterpretation of a contract. Whatever the underlying motive for expulsion might have been, this case has been submitted and tried on the interpretation of the contract, not on a theory of discrimination." 93 Idaho, at 303–304, 460 P. 2d, at 728–729. Thus, the trial judge's conclusion of law in sustaining Lockridge's claim specifically incorporates the assumption that the Union's "acts . . . were predicated solely upon the ground that [Lockridge] had failed to tender periodic dues in conformance with the requirements of the union Constitution and employment contract as they interpreted [it] . . . ." App. 66. Further, the trial court excluded as irrelevant petitioner's proffer of evidence designed to show that the Union's interpretation of the contract was reasonably based upon its understanding of prior collective-bargaining agreements negotiated with Greyhound. Tr. 259–260.

Nor can it be fairly argued that our resolution of respondent's final contentions entails simply attaching variegated labels to matters of equal substance. We have exempted § 301 suits from the *Garmon* principle because of the evident congressional determination that courts should be free to interpret and enforce collective-bargaining agreements even where that process may involve condemning or permitting conduct arguably subject to the protection or prohibition of the National Labor Relations Act. The legislative determination that courts are fully competent to resolve labor relations disputes through focusing on the terms of a collective-bargaining agreement cannot be said to sweep within it the same conclusion with regard to the terms of union-employee contracts that are said to be implied in law. That is

why the principle of *Smith* v. *Evening News* is applicable only to those disputes that are governed by the terms of the collective-bargaining agreement itself.

Similarly, this Court's refusal to limit judicial competence to rectify a breach of the duty of fair representation rests upon our judgment that such actions cannot, in the vast majority of situations where they occur, give rise to actual conflict with the operative realities of federal labor policy. The duty of fair representation was judicially evolved, without the participation of the NLRB, to enforce fully the important principle that no individual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers. Where such union conduct is proved it is clear, beyond doubt, that the conduct could not be otherwise regulated by the substantive federal law. And the fact that the doctrine was originally developed and applied by courts, after passage of the Act, and carries with it the need to adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives ensures that the risk of conflict with the general congressional policy favoring expert, centralized administration, and remedial action is tolerably slight. *Vaca* v. *Sipes, supra,* at 180-181. So viewed, the duty of fair representation, properly defined, operates to limit the scope of *Garmon* where the sheer logic of the preemption principle might otherwise cause it to be extended to a point where its operation might be unjust. *Vaca* v. *Sipes, supra,* at 182-183. If, however, the congressional policies *Garmon* seeks to promote are not to be swallowed up, the very distinction, embedded within the instant lawsuit itself, between honest, mistaken conduct, on the one hand, and deliberate and severely hostile and irrational treatment, on the other, needs strictly to be maintained.

## IV

Finally, we deem it appropriate to discuss briefly two other considerations underlying the conclusion we have reached in this case. First, our decision must not be taken as expressing any views on the substantive claims of the two parties to this controversy. Indeed, our judgment is, quite simply, that it is not the task of federal or state courts to make such determinations. Secondly, in our explication of the reasons for the *Garmon* rule, and the various exceptions to it, we noted that, although largely of judicial making, the labor relations pre-emption doctrine finds its basic justification in the presumed intent of Congress. While we do not assert that the *Garmon* doctrine is without imperfection, we do think that it is founded on reasoned principle and that until it is altered by congressional action or by judicial insights that are born of further experience with it, a heavy burden rests upon those who would, at this late date, ask this Court to abandon *Garmon* and set out again in quest of a system more nearly perfect. A fair regard for considerations of *stare decisis* and the coordinate role of the Congress in defining the extent to which federal legislation pre-empts state law strongly support our conclusion that the basic tenets of *Garmon* should not be disturbed.[9]

For the reasons stated above, the judgment below is

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

I would affirm this judgment on the basis of *Machinists* v. *Gonzáles*, 356 U. S. 617, rather than overrule it. I

---

[9] Indeed, MR. JUSTICE WHITE's dissenting opinion fails to demonstrate the need for such a departure from our traditional judicial role. On the contrary, he affirmatively establishes that Congress has taken an active, conscious role in apportioning power to deal with controversies implicating federal labor law among various competent tribunals.

would not extend *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, so as to make Lockridge, the employee, seek his relief in faraway Washington, D. C., from the National Labor Relations Board.

When we hold that a grievance is "arguably" within the jurisdiction of the National Labor Relations Board and remit the individual employee to the Board for remedial relief, we impose a great hardship on him, especially where he is a lone individual not financed out of a lush treasury. I would allow respondent recourse to litigation in his home town tribunal and not require him to resort to an elusive remedy in distant and remote Washington, D. C., which takes money to reach.

He has six months within which to file an unfair labor practice charge with the Regional Director and serve it upon the other party. If he does not file within six months, the claim is barred. 29 U. S. C. § 160 (b). The charge must be in writing and contain either a declaration that the contents are true to the best of his knowledge, or else a notarization. 29 CFR § 101.2. When the charge is received, it is filed, docketed, and given a number (29 CFR § 101.4) and assigned to a member of the field staff for investigation. 29 CFR § 101.4.

Following the investigation, the Regional Director makes his decision. "If investigation reveals that there has been no violation of the National Labor Relations Act or the evidence is insufficient to substantiate the charge, the regional director recommends withdrawal of the charge by the person who filed." 29 CFR § 101.5. If the complaining party does not withdraw the charge, the Regional Director dismisses it. 29 CFR § 101.6. Following dismissal, the complainant has 10 days to appeal the decision to the General Counsel who reviews the decision. *Ibid.* If the General Counsel holds against the complaining party and refuses to issue an unfair labor practice complaint, the decision is apparently un-

reviewable. A. Cox & D. Bok, Labor Law 138 (7th ed. 1969); *General Drivers Local 886* v. *NLRB*, 179 F. 2d 492.

From the viewpoint of an aggrieved employee, there is not a trace of equity in this long-drawn, expensive remedy. If he musters the resources to exhaust the administrative remedy, the chances are that he too will be exhausted. If the General Counsel issues a complaint, then he stands in line for some time waiting for the Board's decision.[1] If the General Counsel refuses to act, then the employee is absolutely without remedy. For as *Garmon* states:

"[T]he Board may also fail to determine the status of the disputed conduct by declining to assert juris-

---

[1] For the backlog of the Board see 34th Annual Report of NLRB for fiscal year 1969. Table 1, p. 196, shows the following number of unfair labor practice cases:

| | |
|---|---:|
| Pending July 1, 1968 | 7,377 |
| Received fiscal 1969 | 18,651 |
| On docket fiscal 1969 | 26,028 |
| Closed fiscal 1969 | 18,939 |
| Pending June 30, 1969 | 7,089 |

Table 8, p. 212, shows that the 18,939 unfair labor practice cases in 1969 were closed as follows:

| | |
|---|---:|
| Before issuance of complaint | 16,135 |
| After issuance of complaint, before opening of hearing | 1,251 |
| After hearing opened, before issuance of Trial Examiner's decision | 186 |
| After Trial Examiner's decision, before issuance of Board decision | 134 |
| After Board order adopting Trial Examiner's decision in absence of exceptions | 131 |
| After Board decision, before circuit court decree | 606 |
| After circuit court decree, before Supreme Court action | 427 |
| After Supreme Court action | 69 |

Of the foregoing—

31% were dismissed before complaint.

24.9% were settled and adjusted.

36% were withdrawn before complaint.

In only 5.7% did the Board issue orders. *Id.*, at 4.

diction, or by refusal of the General Counsel to file a charge, or by adopting some other disposition which does not define the nature of the activity with unclouded legal significance. This was the basic problem underlying our decision in *Guss* v. *Utah Labor Relations Board,* 353 U. S. 1. In that case we held that the failure of the National Labor Relations Board to assume jurisdiction did not leave the States free to regulate activities they would otherwise be precluded from regulating. It follows that the failure of the Board to define the legal significance under the Act of a particular activity does not give the States the power to act." 359 U. S., at 245–246.

From this it follows that if the General Counsel refuses to act, no one may act and the employee is barred from relief in either state or federal court.[2] See *Day* v. *Northwest Division 1055,* 238 Ore. 624, 389 P. 2d 42, cert. denied, 379 U. S. 878.

When we tell a sole individual that his case is "arguably" within the jurisdiction of the Board, we in practical effect deny him any remedy. I repeat what I said before, "When the basic dispute is between a union and an employer, any *hiatus* that might exist in the jurisdictional balance that has been struck can be filled by resort to economic power. But when the union member has a dispute with his union, he has no power on which to rely." *Plumbers' Union* v. *Borden,* 373 U. S. 690, 700 (dissenting).

*Garmon* involved a union-employer dispute. It should not be extended to the individual employee who seeks a remedy for his grievance against his union.

---

[2] Since we have yet to rule on the reviewability of the refusal of the General Counsel to act, that route might be open although at present the authority is to the contrary. See A. Cox & D. Bok, Labor Law 138 (7th ed. 1969).

The complaint in this state court suit sought damages from the union for its action in causing the employer to discharge him pursuant to the union-security clause in the collective-bargaining agreement. It also asked for "such other and further relief as to the court may appear meet and equitable in the premises."

It appears that the collective agreement only required Lockridge to be a *member* of the union as a condition of employment, not a *member in good standing.* Lockridge, it appears, was one month delinquent in payment of dues but was still a member.

The case for relief by Lockridge in a state court is as strong as, if not stronger than, the case of Gonzales. Lockridge, who was refused employment because of the union's representations to the employer, had never been expelled from the union. On the other hand, Gonzales had been expelled from the union because he brought assault and battery charges against a representative of the union. He sued for restoration of membership and for damages. The state court found that the union had breached its contract with the employee and ordered him reinstated and awarded him damages. 356 U. S., at 618. We sustained the state court, saying that "the subject matter of the litigation . . . was the breach of a contract governing the relations" between the employee and the union and that the "suit did not purport to remedy or regulate union conduct on the ground that it was designed to bring about employer discrimination against an employee, the evil the Board is concerned to strike at as an unfair labor practice under § 8 (b)(2)." *Id.,* at 621–622. We held that in those circumstances the state court had power to order the employee reinstated to membership and was not deprived of jurisdiction to "fill out" his remedy by awarding damages. *Id.,* at 620–621.

Whether in the present case the discharge of Lockridge

was "arguably" an unfair labor practice within the meaning of *Garmon* is irrelevant. The reason is that the Board would not have the power to supply the total remedy which Lockridge seeks even if the employer had committed an unfair labor practice. True, the Board has authority to award back pay [3] but it has no authority to award damages beyond back pay. Moreover, under *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192, the union is in a fiduciary relation to its members. As we stated in *Vaca* v. *Sipes*, 386 U. S. 171, 177:

> "Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."

We emphasized in the *Sipes* case that the *Garmon* rule was "not applicable to cases involving alleged breaches of the union's duty of fair representation." *Id.*, at 181. We held that in this type of case Congress did not intend "to oust the courts of their traditional jurisdiction to curb arbitrary conduct by the individual employee's statutory representative." *Id.*, at 183.

As demonstrated by Mr. Justice White in his dissent in this case, the exceptions to the pre-emption rule are so many and so important that they make amazing the Court's "uncritical resort to it."

---

[3] Under § 10 (c) of the Act, 29 U. S. C. § 160 (c), the Board can award back pay against an employer, *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, and the Board will order back pay against a union where it causes an employer to discriminate against an employee. See *International Association of Heat & Frost Insulators, Local 84*, 146 N. L. R. B 660; *United Mine Workers (Blue Diamond Coal Co.)*, 143 N. L. R. B. 795.

The wrongs suffered by Lockridge stemmed from the union's breach of its contract. Rather than overrule *Gonzales,* we should reaffirm what we said there:

> "[T]he protection of union members in their rights as members from arbitrary conduct by unions and union officers has not been undertaken by federal law, and indeed the assertion of any such power has been expressly denied. The proviso to § 8 (b) (1) of the Act states that 'this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . .' 61 Stat. 141, 29 U. S. C. § 158 (b)(1). The present controversy is precisely one that gives legal efficacy under state law to the rules prescribed by a labor organization for 'retention of membership therein.' Thus, to preclude a state court from exerting its traditional jurisdiction to determine and enforce the rights of union membership would in many cases leave an unjustly ousted member without remedy for the restoration of his important union rights. Such a drastic result, on the remote possibility of some entanglement with the Board's enforcement of the national policy, would require a more compelling indication of congressional will than can be found in the interstices of the Taft-Hartley Act." 356 U. S., at 620.

Where the quarrel between the employee and the union is over a particular job, his remedy is before the Board. *Plumbers' Union* v. *Borden,* 373 U. S. 690; *Iron Workers* v. *Perko,* 373 U. S. 701. But where the union contract is breached by expulsion of the employee, as alleged in *Gonzales,* or where he is wrongfully treated as no longer being a member of the union (which is the present case) the suit lies in the state court for damages, for declaratory or other relief that he still is a member, and for such other remedies as may be appropriate.

While I joined the dissent in *Gonzales,* experience under *Garmon* convinces me that we should not apply its rule to the grievances of individual employees against a union. I would affirm the judgment below.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE joins, dissenting.

Like MR. JUSTICE DOUGLAS, I would neither overrule nor eviscerate *Machinists* v. *Gonzales,* 356 U. S. 617 (1958). In light of present statutory law and congressional intention gleaned therefrom, state courts should not be foreclosed from extending relief for union deprivation of members' state law rights under the union constitution and bylaws. Even if I agreed that the doctrine of *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), properly pre-empts such union member actions based on state law where the challenged conduct is arguably an unfair labor practice, I could not join the opinion of the Court since it unqualifiedly applies the same doctrine where the conduct of the union is only arguably protected under the federal law.

The *Garmon* doctrine, which is today reaffirmed and extended, has as its touchstone the presumed congressional goal of a uniform national labor policy; to this end, the Court has believed, the administration of that policy must insofar as is possible be in the hands of a single, centralized agency. In many ways I have no quarrel with this view. Many would agree that as a general matter some degree of uniformity is preferable to the conflicting voices of 50 States, particularly in view of the structure of industrial and commercial activities in this country. Congress determined as much when it enacted the National Labor Relations Act (NLRA).

But it is time to recognize that Congress has not federalized the entire law of labor relations, even labor-management relations, and that within the area occupied

by federal law neither Congress, this Court, nor the National Labor Relations Board itself has, in the name of uniformity, insisted that the agency always be the exclusive expositor of federal policy in the first instance. To put the matter in proper perspective it will be helpful to set down some of the important contexts in which federal law is implemented by the courts or other institutions without the prior intervention of the Board, as well as those in which state rather than federal law is permitted to operate. Part I, following, undertakes this task. Against that background, Part II deals with union member actions against their union, and Part III considers the *Garmon* doctrine in those situations where the conduct complained of is arguably protected by federal law.

## I

It is well established that the Board has jurisdiction over unfair labor practices even though they might also be arguable violations of the collective-bargaining agreement and subject to arbitration under the terms of the contract. See 29 U. S. C. § 160 (a); *Carey* v. *Westinghouse Corp.*, 375 U. S. 261, 272 (1964); *NLRB* v. *Strong*, 393 U. S. 357, 360–361 (1969); *NLRB* v. *Acme Industrial Co.*, 385 U. S. 432 (1967). But as a policy matter the Board will not overturn arbitration awards based on behavior that is also an alleged unfair labor practice if the arbitration proceedings comply with certain procedures, among which is that the arbitrator must have given consideration to the alleged unfair labor practice. *Spielberg Mfg. Co.*, 112 N. L. R. B. 1080 (1955); *International Harvester Co.*, 138 N. L. R. B. 923 (1962), enforced *sub nom. Ramsey* v. *NLRB*, 327 F. 2d 784 (CA7 1964). The Board has said:

> "If complete effectuation of the Federal policy is to be achieved, we firmly believe that the Board, which

is entrusted with the administration of one of the many facets of national labor policy, should give hospitable acceptance to the arbitral process as 'part and parcel of the collective bargaining process itself,' and voluntarily withhold its undoubted authority to adjudicate alleged unfair labor practice charges involving the same subject matter, unless it clearly appears that the arbitration proceedings were tainted by fraud, collusion, unfairness, or serious procedural irregularities or that the award was clearly repugnant to the purposes and policies of the Act." *International Harvester Co., supra,* at 927 (citations omitted).

See also *Carey* v. *Westinghouse Corp., supra,* at 270–272; *Raley's Inc.,* 143 N. L. R. B. 256 (1963).

Thus, not only does Board policy *allow* arbitrators to pass on conduct which is also an alleged unfair labor practice, but the Board will not consider an unfair labor practice charge *unless* the arbitrator has passed on it.[1] And even then, the Board has made quite clear that its standard of review is far from *de novo;* it will let stand an arbitrator's award not "clearly repugnant" to the Act. See, *e. g., Virginia-Carolina Freight Lines,* 155 N. L. R. B. 447 (1965), where the Board refused to uphold an arbitrator's award allowing discharge of an employee for "disloyalty" where the "disloyalty" consisted of seeking assistance from the Board. The Board's standard of review for arbitration awards seems to be even narrower than the substantial-evidence test, for the Board has not purported to overturn awards simply on the evidence before the arbitrator. The standards chosen by the Board operate entirely separately from the substantial-

---

[1] This obviously does not apply unless the parties have agreed to arbitrate. Cf. *Smith* v. *Evening News Assn.,* 371 U. S. 195, 196 n. 1 (1962).

evidence test. See § 10 (e), Administrative Procedure Act, 5 U. S. C. § 706 (1970 ed.). In fact, in *International Harvester* itself, the Board agreed to accept the arbitrator's award "since it plainly appears to us that the award is not palpably wrong." To require a wider scope of evidentiary review, said the Board, "would mean substituting the Board's judgment for that of the arbitrator, thereby defeating the purposes of the Act and the common goal of national labor policy of encouraging the final adjustment of disputes, 'as part and parcel of the collective bargaining process.'" 138 N. L. R. B., at 929.

Congress, no less than the Board, has indicated its approval and endorsement of the arbitral process even though this may result in controversies being adjudicated by forums other than the Board. Section 203 (d) of the Labor Management Relations Act (LMRA), 1947, 61 Stat. 154, 29 U. S. C. § 173 (d), declares:

> "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement."

See *United Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564, 566–568 (1960); *United Steelworkers* v. *Warrior & Gulf Co.*, 363 U. S. 574, 582 (1960). See also § 10 (k) of NLRA, 29 U. S. C. § 160 (k). Indeed, § 301 (a) of the LMRA, 29 U. S. C. § 185 (a), may be considered the birthplace of much of modern arbitration law. As the Court said in *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 455 (1957): "[Section 301] expresses a federal policy that federal courts should enforce these [arbitration] agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way."

Finally, this Court itself has expressed the view, in construing federal law pursuant to § 301 (a), that the policy of encouraging arbitration was sufficient to overcome considerations favoring pre-emption. In the Court's words, "Arbitral awards construing a seniority provision . . . or awards concerning unfair labor practices, may later end up in conflict with Board rulings. . . . Yet, as we held in *Smith* v. *Evening News Assn.* [371 U. S. 195 (1962)], the possibility of conflict is no barrier to resort to a tribunal other than the Board." *Carey* v. *Westinghouse Corp.*, 375 U. S., at 272.

The cumulative effect of all of this is that the jurisdiction of one forum—in this case, arbitration—is not displaced simply because the Board also has jurisdiction to act. The policy of pre-emption and, to some extent, of uniformity itself is subordinated to the greater policy of encouraging arbitration of grievances.

Deference to the arbitral forum is not the only instance where arguable or conceded unfair labor practices are excepted from the pre-emption doctrine. In *Smith* v. *Evening News Assn.*, 371 U. S. 195 (1962), the employee brought suit under § 301 (a) of the LMRA, 29 U. S. C. § 185 (a), to enforce the collective-bargaining contract, alleging that the employer discriminated against certain employees because of their union affiliation. The conduct, if proved, would not only have been a violation of the contract but would concededly have been an unfair labor practice as well. The Court expressly rejected the *Garmon* doctrine in the context of such suits, holding that, while Board jurisdiction over unfair labor practices was not displaced when the conduct also allegedly violated the terms of the contract, neither was the jurisdiction exclusive. This result was consistent with the expressed intent of Congress that enforcement of collective-bargaining agreements be "left to the usual processes of the law," rather than to the Board. *Charles Dowd Box*

*Co.* v. *Courtney,* 368 U. S. 502, 511 (1962). See also *Local 174* v. *Lucas Flour Co.,* 369 U. S. 95, 101 n. 9 (1962); Sovern, Section 301 and the Primary Jurisdiction of the NLRB, 76 Harv. L. Rev. 529 (1963).

These cases, like those dealing with arbitration, indicate a willingness to subordinate the *Garmon* doctrine when other, more-pressing problems are at hand. Here, the policy to be served was that collective-bargaining agreements be enforced by the judiciary, notwithstanding concurrent Board jurisdiction to regulate that activity which was also an unfair labor practice. To be sure, the Court has required that, in the interests of uniform development of the law; state courts must apply federal law. *Lucas Flour, supra,* at 102–104. But the Court was no less aware in *Smith* than it had been nine years earlier in *Garner* v. *Teamsters Union,* 346 U. S. 485, 490–491 (1953), that: "A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law." The point is simply that the perceived interest in judicial adjudication of contractual disputes was more important than the interests of uniformity that would be promoted by pre-emption.

In *Vaca* v. *Sipes,* 386 U. S. 171 (1967), this Court refused to apply the pre-emption doctrine to suits charging a breach of the union's duty of fair representation, even though the Board had held that such a breach was also an unfair labor practice. *Miranda Fuel Co.,* 140 N. L. R. B. 181 (1962). Though one reason for this result was that the duty of fair representation had been for the most part developed by the judiciary rather than the Board, the other reason was concern over the possibility of denying a hearing to an employee who felt his individual interests had been unfairly subordinated by the union. The Court expressed fear that, were pre-emption the rule, "the individual employee injured by

arbitrary or discriminatory union conduct could no longer be assured of impartial review of his complaint, since the Board's General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint." 386 U. S., at 182.

Congress has expressly given a federal cause of action for damages to parties injured by secondary union activity under § 8 (b)(4), which may be enforced by suits brought in either state or federal court. 29 U. S. C. § 187 (b). The union's activity giving rise to liability is of necessity an unfair labor practice, but Congress elected to have the question adjudicated in court, even though the activity might be the subject of a parallel and possibly inconsistent determination by the Board. See *Teamsters Union* v. *Morton,* 377 U. S. 252, 256 (1964). Of course federal law governs such cases, at least where the union activity is not violent; and presumably the decisions of the NLRB on secondary activity would be consulted for guidance. But the Congress chose not to have the Board hear such suits, even though the Board is probably far more familiar than the courts with the variety of problems posed by secondary activity.

The phenomenon of the no-man's land and the conclusions that can be drawn on pre-emption are also instructive, for they cast substantial doubt not only on the intent of Congress but on the very foundations of *Garmon* itself. In *Guss* v. *Utah Labor Relations Board,* 353 U. S. 1 (1957), the Court held that States were powerless to intervene in labor disputes where the NLRB possessed jurisdiction, even though the Board had refused to assert its jurisdiction because of the "predominantly local" character of the company's operations. The Court conceded that this would likely produce "a vast no-man's-land, subject to regulation by no agency or court," *id.,* at 10, but insisted this was the intent of the Congress and that Congress could change the situation if it desired.

Congress did change the situation soon thereafter, providing that the States may assert jurisdiction over any dispute where the Board declines to do so because of the insubstantial effect on interstate commerce. § 14 (c) of NLRA, as amended, 73 Stat. 541, 29 U. S. C. § 164 (c). The purpose of this section was to fill the chasm created by *Guss.* See, *e. g.,* 105 Cong. Rec. 6430 (Sen. Goldwater). The situation was roundly condemned by legislators, who called it variously "a no man's land, in which there are grievous wrongs and no remedy under American jurisprudence as of this time," *id.,* at 6413 (Sen. McClellan), and "a stench in the nostrils of justice." *Id.,* at 6544 (Sen. Ervin). In short, the reaction to *Guss* indicates that this Court was quite wrong in determining that the no-man's land was justified in the name of congressional intent to achieve uniformity in law and administration.

Of some interest is the fact that *Garmon* was based upon, and expanded to a significant degree, the rationale of *Guss:*

> "It follows [from *Guss*] that the failure of the Board to define the legal significance under the Act of a particular activity does not give the States the power to act. In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this Court to decide whether such activities are subject to state jurisdiction. *The withdrawal of this narrow area from possible state activity follows from our decisions in* Weber *and* Guss." 359 U. S., at 246. (Emphasis added.)

Yet five months after the announcement of the *Garmon* decision, Congress in effect overruled *Guss* and thus at least counseled caution in applying the *Garmon* rationale:

The provisions of § 14 (c), however, do not allow state jurisdiction where the Board refuses to assert jurisdiction for "policy" reasons, as where the General Counsel refuses to issue a complaint because he is not convinced of the merits of the plaintiff's cause. In such a situation, *Garmon* precludes state action (or action by federal courts) because the Board's action does not define the activity "with unclouded legal significance." 359 U. S., at 246. In 1965, the Court eased the harsh strictures of *Garmon* in this area by holding that reasons articulated by the General Counsel for his refusal to issue a complaint would open the way for state action if the explanations "squarely define the nature of the activity" sought to be subjected to Board consideration. *Hanna Mining Co.* v. *Marine Engineers Beneficial Assn.*, 382 U. S. 181, 192 (1965).

Even though federal law is pervasive in labor-management relations, state law is preserved in some respects. At first blush, it might seem that these matters present no problems of uniformity, for there is no national law being applied. But the simple fact that Congress and this Court have deferred to the States in these areas indicates a subordination of the interest in uniformity to the interests of the States. By making the matter one of state law, Congress has not only authorized multiformity on the subject, but practically guaranteed it. The results, as far as uniformity is concerned, are no different than if the States applied federal law with abandon. For example, the controversial § 14 (b) of NLRA, 61 Stat. 151, 29 U. S. C. § 164 (b), has authorized States to choose for themselves whether to require or permit union shops. This allows the States to regulate union or agency shop clauses, *Algoma Plywood Co.* v. *Wisconsin Board*, 336 U. S. 301 (1949), *Retail Clerks* v. *Schermerhorn*, 373 U. S. 746, 375 U. S. 96 (1963), so that union insistence on a security agreement as part of a col-

lective-bargaining agreement may be prohibited in one State and protected or even encouraged in another. The policy choice made by Congress on this matter necessarily subordinated uniformity in national law to what were perceived to be overriding concerns of the States.

Other examples are familiar. In *United Construction Workers* v. *Laburnum Construction Corp.*, 347 U. S. 656 (1954), the Court upheld a state court damage award for injuries suffered as a result of the tortious conduct of the union's agent, who threatened violence if the company's employees did not join the union. The Court assumed that the union conduct was an unfair labor practice, seeking as it did to interfere with the employee's § 7 right not to join a labor union. But it noted the inadequacy of the existing Board procedure to provide suitable remedies for those injured as a result of the conduct, and was impressed by the fact that to hold the state courts pre-empted "will, in effect, grant petitioners immunity from liability for their tortious conduct." The Court found "no substantial reason for reaching such a result." 347 U. S., at 664. Accord, *Automobile Workers* v. *Russell*, 356 U. S. 634 (1958); *Linn* v. *Plant Guard Workers*, 383 U. S. 53, 61–62 (1966). Again, it is entirely possible that some States will require a greater showing of violence than others before awarding damages, so that behavior that violently seeks to coerce union membership will be prohibited in one State and allowed in another. But the interest in uniformity is subordinated to the larger interests that persons injured by such violence have preserved to them whatever remedies state law may authorize.

To summarize, the "rule" of uniformity that the Court invokes today is at best a tattered one, and at worst little more than a myth. In the name of national labor policy, parties are encouraged by the Board, by Congress, and by this Court to seek other forums if

the unfair labor practice arises in an arbitrable dispute, violates the collective-bargaining agreement, or otherwise qualifies as one of the exceptions mentioned.[2]

Until today, *Machinists* v. *Gonzales, supra,* had been thought to stand for the proposition that *Garmon* did not reach cases "when the possibility of conflict with federal policy is . . . remote." 356 U. S., at 621. But with today's emasculation of *Gonzales,* there is probably little that remains of it. *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966), was ostensibly based in part on this rationale, *id.,* at 59–61, but it was equally bottomed on *Laburnum Construction* and other cases upholding state power to regulate matters of "overriding state interest" such as violence or, as in *Linn,* defamation. I see no reason why this exception has not, for all practical purposes, thus expired. In my view, however, and for the reasons set forth in Part II, *Gonzales* controls this case.[3]

---

[2] A possible addition to the list of exceptions is the provision of § 10 (a), 29 U. S. C. § 160 (a), which allows the Board to cede jurisdiction over labor disputes to state agencies if state law is not inconsistent with federal law. However, this provision has never been invoked by the Board. American Bar Assn., The Developing Labor Law 807 (C. Morris ed. 1971).

[3] With all respect, the majority's attempt to distinguish the instant case from *Gonzales* is unpersuasive. According to the majority, "The reasons for Gonzales' deprivation of union membership had nothing to do with matters of employment, while Lockridge's cause of action and claim for damages were based solely upon the procurement of his discharge from employment." *Ante,* at 296. In the first place, Lockridge squarely alleged that his damages had been caused by suspension from union membership contrary to the constitution and laws of the union; his cause of action was bottomed upon this breach of duty by the union. More importantly, it is inaccurate to imply, as the foregoing quoted statement does, that *Lockridge* is somehow different from *Gonzales* in that Gonzales' "deprivation of union membership" did not result in his loss of employment. The *Gonzales* Court said, "The evidence adduced at the trial showed that plaintiff, *because of* his loss of membership,

## II

There are two broad, but overlapping, relationships among employers, labor unions, and union members. On the one hand, there is the relationship between employer and employee, generally termed labor-management relations, which involves the union at virtually every step, where the employees have chosen to be represented by one. The other relationship, union-member relations, involves the affairs between the union and the employee as union member.

In enacting the NLRA in 1935, 49 Stat. 449, Congress defined and prohibited unfair labor practices by employers. Experience under the Act showed that labor organizations were quite as capable as employers of pernicious behavior, and in 1947 Congress enacted the Labor Management Relations Act, 61 Stat. 136, which, among other things, protected employees and employers against certain unfair labor practices by labor organizations that were defined by the Act. Protection given employees, whether union members or not, was primarily job related. Although unions were forbidden to restrain or coerce employees in the exercise of their § 7 rights, Congress expressly negated any intention to "impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership . . . ." 29 U. S. C. § 158 (b) (1). The unmistakable focus of both the NLRA and the LMRA is on labor-management relations, rather than union-member relations, as such.

---

was unable to obtain employment and was *thereby* damaged. . . . [T]his damage was not charged nor treated as the result of an unfair labor practice but *as a result of* the breach of contract." 356 U. S., at 622 n. (Quoting the California court's opinion.) (Emphasis added.)

During the 1950's there came to light various patterns of union abuse of power, and in the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 519, Congress acted to correct these evils by directly addressing itself to some aspects of union-member affairs. The LMRDA provides a "bill of rights," which gives union members the right to participate in union affairs, to speak freely, and to be protected from arbitrary discipline. It also imposes certain requirements on unions to disclose their financial affairs, regulates union elections, and safeguards labor organizations against unscrupulous agents or officers. Throughout the Act are provisions for civil or criminal enforcement of the Act in federal courts. See 73 Stat. 523, 525, 529–530, 531, 534, 536, 537, 539. But in a crucial departure from what the Court has held the legislative intention was in regulating *labor-management* relations, the Congress declared:

> "Except as explicitly provided to the contrary, nothing in this Act shall reduce or limit the responsibilities of any labor organization or any officer . . . or other representative of a labor organization . . . under any other Federal law or under the laws of any State, and, *except as explicitly provided to the contrary, nothing in this Act shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State.*" § 603 (a), 73 Stat. 540, 29 U. S. C. § 523 (a) (emphasis added).

If this were not clarity enough, Congress also provided in Title I, the "bill of rights":

> "Nothing contained in this title shall limit the rights and remedies of any member of a labor organization under any State or Federal law or before any court or other tribunal, or under the constitution

and bylaws of any labor organization." § 103, 73 Stat. 523, 29 U. S. C. § 413.

Beyond any doubt whatever, although Congress directly imposed some far-reaching *federal* prohibitions on union conduct, it specifically denied any pre-emption of rights or remedies created by either state law or union constitutions and bylaws. Thus, as to union-member relations, any parallel rights created by the States, either directly or indirectly through enforcement of union constitutions or bylaws, were to stand at full strength. Congress backed up this power by requiring unions to make available to members the constitution and bylaws of the union, as well as financial information. § 201, 73 Stat. 524, 29 U. S. C. § 431.

The LMRDA was a major effort by Congress to regulate the rights and responsibilities of the union-member relationship as such, but, as shown by § 603 (a), it was clearly not an attempt to make federal law the exclusive arbiter of this relationship.[4]   In *Gonzales* the Court

---

[4] Not only were the rights and obligations created by the LMRDA made supplemental to state law, but large areas of union-member relations were left untouched. For instance, Title I provides that "nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution . . . ." § 101 (a)(2), 73 Stat. 522, 29 U. S. C. § 411 (a)(2). Precisely what a union member may be required to do as part of his "responsibility . . . toward the organization as an institution" is obviously far ranging, and Congress could no doubt have defined those responsibilities had it chosen to do so. For another instance, Congress protected the right of the union member to sue a labor organization, but conditioned this on whatever exhaustion of "reasonable hearing procedures . . . within such organization" the union may require. § 101 (a)(4), 29 U. S. C. § 411 (a)(4). When compared to the step-by-step statutory procedure required for the adjudication of unfair labor practices, 29 U. S. C. § 160, it is clear that Congress meant to leave some flexibility to the unions

noted that "the protection of union members in their rights as members from arbitrary conduct by unions and union officers has not been undertaken by federal law . . . ." 356 U. S., at 620. Though in the following year the LMRDA certainly "undertook" to protect members in important respects, it specifically disavowed any notion of pre-empting state law and thus left unimpaired the *Gonzales* conclusion that state law has a proper role in union-member disputes.[5]

If, as I have attempted to show in Part I, the Board is not the sole arbiter even of federal law and if, as I have also attempted to show, there is room for the operation of state law in certain areas of even labor-management relations, then to me the conclusion is inescapable that in the area of union-member relations, which Congress has not sought to deal with comprehensively and where Congress has preserved state remedies for the very conduct prohibited by federal law, we should be very careful about assuming congressional intention to brush aside local rights and remedies. Indeed, far from pre-empting state law, one of the major thrusts of the LMRDA was to enforce state rights and remedies. At the very least, the inquiry presented by this or any other case dealing with union-member relations cannot be

---

in dealing with member complaints. Still other examples may be seen by noting what Congress omitted even from mention. Perhaps most important of all in this context is the fact that Congress provided for no central agency, such as it had in the NLRA, to administer the Act. Although the Secretary of Labor has in some respects a major role in implementing the Act, disputes arising under the Act are for the courts in the first instance.

[5] The majority's opinion simply refuses to face this issue. There is no "absence of a contrary expression of intention from Congress," as the majority contends. See *ante,* at 288 n. 5. When Congress addressed itself to union-member relations as such it specifically preserved existing state remedies even though there may be federal remedies to redress the same conduct.

answered by automatic invocation of the purported rule of pre-emption in the name of uniformity.

Like many States, Idaho construes the union-member relation to be a contractual one, defined by the constitution and bylaws of the union. As such, the contracts are enforceable through the State's traditional common-law jurisdiction. Here, Lockridge was discharged for alleged nonpayment of dues in accordance with the union constitution and brought suit alleging that he had in fact not been unduly tardy and that the union's action was a breach of the contract. The face of the complaint did not implicate federal law. If the Idaho court were allowed to proceed, it would not have purported to adjudicate an unfair labor practice by reference to federal law but, if it found the conduct unprotected by federal law, see Part III, *infra*, would have enforced rights and obligations created by the union constitution. The Court nevertheless holds that because the union conduct alleged in the complaint also constitutes, or arguably so, an unfair labor practice, the controversy must be adjudicated by the National Labor Relations Board. I find little in the Court's opinion to convince me that Congress intended this result. With all respect, I agree with *Gonzales* that this result is at best "abstractly justifiable, as a matter of wooden logic." 356 U. S., at 619.

Furthermore, this Court's decision in *Smith* v. *Evening News, supra,* seems contrary to the result reached today. *Smith* held that suits to enforce the collective-bargaining agreement could be brought in state or federal courts under § 301 notwithstanding the fact that the conduct alleged would also constitute an unfair labor practice. Thus, courts enforcing *Smith*-type actions are dealing in contract rights, not unfair labor practices. There seems little reason why suits for breach of the union-member contract cannot similarly be brought in state courts (or in federal courts in diversity actions), notwith-

standing the alternate nature of the behavior as an unfair labor practice.

Indeed, § 301 actions are governed by federal law and even here the NLRB does not pre-empt the courts. There is even less justification for precluding actions under state law in the area of union-member relations which Congress has expressly said is not an exclusively federal domain.

I find no merit in the argument that Congress passed § 301 though recognizing that some § 301 suits would involve unfair labor practices, but, by *not* providing analogous federal court jurisdiction for breaches of union constitutions, manifested its expectation that breaches which also involve unfair labor practices should be a matter for Board jurisdiction. Some readily imaginable union actions prohibited by Title I of the LMRDA could be unfair labor practices as well, but by providing for federal suit to enforce the remedies, and leaving state remedies untouched, Congress certainly disavowed, as clearly as if it had said so explicitly, any notion that the Board was to pre-empt other forums in passing on statutory breaches which were also unfair labor practices. Arbitration of grievances is a similar situation, since arbitrators, rather than the Board, construe and enforce contractual rights that are breached in the commission of putative unfair labor practices. See Part I, *supra*.

## III

I have attempted to show in Part II that invocation of *Garmon*-type pre-emption is inappropriate where a union member brings suit against a union for breach of the union's constitution or bylaws. Wholly apart from such considerations, however, I cannot agree with the opinion of the Court because it reaffirms the *Garmon* doctrine as applied to conduct arguably protected under § 7, as well as to that arguably prohibited under § 8.

The essential difference, for present purposes, between activity that is arguably prohibited and that which is arguably protected is that a hearing on the latter activity is virtually impossible unless one deliberately commits an unfair labor practice. In a typical unfair practice case, by alleging conduct arguably prohibited by § 8 the charging party can at least present the General Counsel with the facts, and if the General Counsel issues a complaint, the charging party can present the Board with the facts and arguments to support the claim. But for activity that is arguably protected, there is no provision for an authoritative decision by the Board in the first instance; yet the *Garmon* rule blindly pre-empts other tribunals. *Longshoremen's Assn.* v. *Ariadne Shipping Co.*, 397 U. S. 195, 201 (1970) (WHITE, J., concurring). The Assistant General Counsel of the NLRB has described the situation:

> "[A]pplication of the *Garmon* 'arguably protected' test in this situation leaves the employer's interests in an unsatisfactory condition. The employer cannot obtain relief from the state court with respect to activity that may in fact not be protected by section 7 of the Act, and the only way that he can obtain a Board determination of that question is by resorting to self-help measures; if he guesses wrong, this may subject him not only to a Board remedy but also to tort suits. That result is as undesirable as the 'no-man's land' created by the holding in *Guss* . . . ." (Footnotes omitted.) Come, Federal Preemption of Labor-Management Relations: Current Problems in the Application of *Garmon*, 56 Va. L. Rev. 1435, 1444 (1970).

I believe that the considerations that justify exceptions to the rule of uniformity apply with greater force to § 7 situations and further, that basic concepts of

fundamental fairness, regardless of their effect on the model of uniformity, counsel against any rule that so inflexibly bars a hearing.

### A

The Assistant General Counsel of the Board has stated the paradox succinctly:

> "When a union engages in peaceful picketing that is not prohibited by section 8 of the NLRA, a state court cannot enjoin the picketing as a trespass because the activity is 'arguably protected' by section 7. But since there is no unfair labor practice, the employer cannot bring the question before the Board for adjudication. The only way for him to get a Board ruling as to whether the picketing is actually protected is to resort to 'self-help' to expel the pickets, thereby forcing the union to file unfair labor practice charges to which he can raise the status of the picketing as a defense." Come, *supra*, at 1437–1438.

Though the most natural arena for this conflict occurs when picketers trespass on private property, see *Taggart v. Weinacker's, Inc.,* 397 U. S. 223, 227 (1970) (BURGER, C. J., concurring), Broomfield, Preemptive Federal Jurisdiction Over Concerted Trespassory Union Activity, 83 Harv. L. Rev. 552 (1970), other instances include "quickie" strikes or slowdowns, see *NLRB* v. *Holcombe,* 325 F. 2d 508 (CA5 1963), or employees' inaccurate complaints to state officials about sanitary conditions in the plant, *Walls Mfg. Co.* v. *NLRB,* 116 U. S. App. D. C. 140, 321 F. 2d 753 (1963), or collective activity designed to persuade the employer to hire Negroes, *NLRB* v. *Tanner Motor Livery, Ltd.,* 349 F. 2d 1 (CA9 1965), or failure to participate in a union check-off, *Radio Officers' Union* v. *NLRB,* 347 U. S. 17, 24–28, 39–42 (1954).

There seems little point in a doctrine that, in the name of national policy, encourages the commission of unfair labor practices, the evils which above all else were the object of the Act. Surely the policy of seeking uniformity in the regulation of labor practices must be given closer scrutiny when it leads to the alternative "solutions" of denying the aggrieved party a hearing or encouraging the commission of a putative unfair labor practice as the price of that hearing.[6]

---

[6] Perhaps the tools with which the Board can fashion relief in this area are already at hand, in the form of the declaratory order. Such an order is binding on the agency and is judicially reviewable. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 372 n. 3 (1969); *Frozen Food Express* v. *United States*, 351 U. S. 40 (1956); *Rochester Telephone Corp.* v. *United States*, 307 U. S. 125 (1939); *Pennsylvania R. Co.* v. *United States*, 363 U. S. 202 (1960). The NLRA gives the Board "authority . . . to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions" of the NLRA. § 6, 29 U. S. C. § 156. The Administrative Procedure Act, in turn, specifically provides that agencies may issue declaratory orders "as in the case of other orders, and in its sound discretion" in order to "terminate a controversy or remove uncertainty." 5 U. S. C. § 554 (e) (1970 ed.). The Board currently provides for declaratory orders in only a few situations, such as for determination of the commercial impact aspect of the jurisdictional issue where the employer has both unfair labor practice charges and representation proceedings pending before the Board, 29 CFR §§ 102.105–102.110. The use of declaratory orders in unfair labor practice proceedings is nonexistent, and the same seems to be true for determining whether or not activities arguably subject to § 7, are protected. See Hickey, Declaratory Orders and the National Labor Relations Board, 45 Notre Dame Law. 89, 106 (1969).

Before an agency may issue a declaratory order, it must have independent subject matter jurisdiction. But we held in *Red Lion, supra,* that the FCC's declaratory order in that case could be sustained on any of several grounds including the requirement that the FCC see that the "public interest be served" in granting and renewing licenses. So here, the argument for Board jurisdiction would be that it is empowered to "prevent any person from engaging

## B

The exceptions to the pre-emption rule are so many and so important as to cast substantial doubt on the Court's uncritical resort to it, as I have attempted to show in Part I. When considered in conjunction with arguably protected activity, however, these exceptions do more than mock the rule; they illustrate substantively why invocation of the rule against such activity is a disservice to the greater interests of national labor policy. For example, the refusal to pre-empt arbitrable disputes serves the policy of encouraging arbitration, a policy universally agreed to be of greater importance than uniformity. See Part I, *supra.* The policy at stake in § 7 cases is simply to secure a resolution of the dispute rather than none at all. Yet the Court's opinion would insist on pre-empting such disputes from the States even though there is no way to present them to the Board. If the Board refused to hear a dispute alleging an unfair labor practice because it wished to encourage arbitration, but ignored the fact that the parties had no arbitration clause in their contract, we could hardly consider arbitration to have been encouraged. But, with all respect, the Court's opinion today is just as exasperating.

Similarly, in holding that alleged breaches of the union's duty of fair representation were not pre-empted, *Vaca* v. *Sipes, supra,* the Court was apprehensive that the worker would be without a forum if the General

in any unfair labor practice." 29 U. S. C. § 160 (a). If, as pointed out earlier, the price of not resorting to an adequate forum for resolution of the § 7 status can be the commission of an unfair labor practice, the power of the Board to prevent unfair labor practices gives it jurisdiction to issue such § 7 declaratory orders. Such an order finding certain conduct protected would override state law, but would be reviewable. If the conduct was found unprotected, there would be no barrier to suits based on state law.

Counsel refused to initiate an unfair labor practice complaint. How much more pressing must those considerations be where the Board is in fact barred from regular adjudication. The "intensely practical considerations" that we felt governed in *Vaca*, 386 U. S., at 183, seem even more practical here, especially in view of the concern expressed in *Vaca* that the aggrieved party be able to obtain a hearing on his complaint. If the possible refusal of the General Counsel to issue a complaint is a prominent reason for refusing to pre-empt the States, I should think that, *a fortiori*, his inability to act at all is at least as great a justification for doing away with pre-emption in this situation.

Finally, it must be mentioned that in precluding the aggrieved party from a hearing, we are following a particularly disfavored course. The importance in our jurisprudence of the opportunity for a hearing need not be reviewed, but at the very least it teaches that where persons with otherwise justiciable claims cannot obtain a hearing under the law, the law is subject to close scrutiny to discover the circumstances compelling this result. There is precious little in the *Garmon* doctrine that justifies its existence as to § 7 activities under this test. Certainly neither the evidence of congressional intent nor the presumed but overdrawn interest in uniformity is adequate to justify denial of a hearing.

Most cases concerning the hearing requirement are those where some adverse consequence is visited upon the individual unless he can explain his side of the story, *Bell* v. *Burson*, 402 U. S. 535 (1971), or where there is continuing conflict and dissatisfaction with no tribunal available to fashion relief. Cf. *Boddie* v. *Connecticut*, 401 U. S. 371 (1971). The problems seem similar to those facing us here. In a § 7 case, the employer is faced with, for example, picketing that turns away customers and suppliers and inflicts progressive economic

injury on the employer. For a small businessman with no forum available for relief, the effect is similar to a wage earner who finds that claims of another have cut his take-home pay in half. Cf. *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969).

The majority's treatment of this important issue is deficient. It says only that treating judicial power to deal with arguably protected activity different from the power to deal with prohibited activity would be "unsatisfactory," since "[b]oth areas equally involve conduct whose legality is governed by federal law, the application of which Congress committed to the Board, not courts." *Ante,* at 290. I have no quarrel with the first point—by definition federal law will determine if federal law protects the conduct from state proscription; but I hardly see how that alone pre-empts state courts. See *Dowd Box, Lucas Flour, Smith* v. *Evening News, Teamsters Union* v. *Morton,* 377 U. S. 252 (1964). As to the second point, the fact is that Congress has not committed the arguably protected area exclusively to the Board. It has provided no mechanism for § 7 cases to get before the Board except where conduct threatens § 7 rights; nor has its functionary, the Board, opened a path to its door for those who seek to ascertain whether conduct threatening them is truly protected by federal law and hence unassailable under local law. Congress found the no-man's land created by *Guss* unacceptable precisely because there was no way to have rights determined. In terms of congressional intention I find it unsupportable to hold that one threatened by conduct illegal under state law may not proceed against it because it is arguably protected by federal law when he has absolutely no lawful method for determining whether that is actually, as well as arguably, the case. Particularly is this true where the dispute is between a union and its members and the latter are asserting claims under state law based

on the union constitution. I would permit the state court to entertain the action and if the union defends on the ground that its conduct is protected by federal law, to pass on that claim at the outset of the proceeding. If the federal law immunizes the challenged union action, the case is terminated; but if not, the case is adjudicated under state law.

MR. JUSTICE BLACKMUN also dissents for the basic reasons set forth by MR. JUSTICE DOUGLAS and MR. JUSTICE WHITE in their respective dissenting opinions.