Marland PAPILLON, Plaintiff,

v.

HUGHES PRINTING CO. et al., Defendants.

Civ. No. 75–969.

United States District Court, M. D. Pennsylvania.

May 27, 1976.

Michael J. Eagen, Jr., Thomas J. Foley, Jr., Scranton, Pa., for plaintiff.

Malcolm L. Pritzker, Philadelphia, Pa., for defendant Hughes Printing Co.

Thomas W. Jennings, Philadelphia, Pa., for defendant Local 350.

## OPINION

MUIR, District Judge.

In this action brought under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), Marland Papillon contends that on November 8, 1974 he was "unjustly discharged" by his employer, Hughes Printing Company (the "Company") and that the Stroudsburg Printing Pressmen and Assistants' Union No. 350 (the "Union"), of which he is a member, breached its duty of fair representation to him by arbitrarily, capriciously and in bad faith refusing to process his grievance arising from the "discharge".

**1314**

Papillon also alleges that the Company and the Union were "wanton and willful" and conspired to deprive him of his rights under the collective bargaining agreement.

The Union and the Company have both filed motions for summary judgment pursuant to F.R.Civ.P. 56. Based on the pleadings, depositions, and exhibits presently on file, the Court is of the view that the following are undisputed:

The printing plant, located in East Stroudsburg, Pennsylvania, where Papillon worked, was originally owned by the Hughes family in the early 1930's. In 1934, the Union won bargaining rights for Journeymen Pressmen and Assistant Pressmen. Under the seniority system which was established for the two categories, a particular Pressman's seniority was "plant-wide". Thus, although an individual was assigned to only one particular press within the plant, he was entitled to "bump" a man of lower seniority who worked on another press rather than be laid off if his own letter press was shut down. This movement from press to press was possible because all letter presses within the plant were basically the same.

In 1960, Hughes sold the East Stroudsburg plant to the Printing Corporation of America. This effected no change in the seniority rights of Journeymen Pressmen and Assistants who continued to work in the plant.

In 1967, the Printing Corporation of America sold the East Stroudsburg facility to the American Can Company. Soon after its purchase of the plant, American Can discovered that the limited output capacity of its letter press equipment in the Stroudsburg plant could not compete with the offset printing presses of other companies which printed the same material. Consequently, after a short-lived attempt to upgrade the East Stroudsburg plant, American Can decided to close it down and to lay off permanently the 550 individuals employed there.

Before this decision could be implemented, Mr. Russell Hughes, of the family which originally owned the plant in the 1930's and a large stockholder in the American Can Company, was approached by parties having an interest in averting the closing. Despite being a retired octogenarian, Hughes undertook to investigate the possibility of re-purchasing the plant in order to prevent the massive layoff which was imminent. Of primary concern to Hughes was the degree of cooperation which he could obtain from the Union if he undertook this venture and made the investment necessary to convert the plant from letter press to offset. Hughes required a definite commitment from the Union in three areas. Only one of those is pertinent to this case.

The offset printing process is comprised of three distinct phases—the Web press, the Sheet-fed press, and Plateburning. Several years of training are required in order for an employee to reach a satisfactory level of competency on only *one* of these phases. Competency in one phase does not qualify an individual to work on any of the other two.

Training at the East Stroudsburg plant was to take place "on the job". Under the plan envisioned by Hughes, employees were to continue to receive their former letter press wages until they attained a level of competency which would entitle them to the higher rates of offset pressmen. The training of an individual in a particular phase of the offset process is expensive. In addition to direct training expenditures, the company bears the costs of each trainee's inferior work product and waste. If the seniority system which obtained in the plant up until the time of the contemplated purchase by Hughes were to have remained in effect, an individual working in, for example, the Web press phase who was about to be laid off could "bump" a Plateburner who had less seniority. The former Web pressman would then have to be completely retrained in Plateburning. Because he believed that the financial consequences of that situation were too severe for the Company, Hughes demanded and the Union acceded to the inclusion of a "one-phase" training restriction in the collective bargaining agreement. Such a provision was

ratified by the Union on July 11, 1970 by a 70 to 6 vote of the general membership.

Lists were prepared of those individuals who wished to be trained in each of the three phases. Until an individual was assigned to a specific offset department, he continued to work on the letter presses which were still operating but were being gradually phased out. When an individual was assigned to a particular phase, he took his respective place on the seniority list *within that classification.*

The operation of the "one-phase" training restriction came into effect whenever a layoff occurred. If the staff in a certain department was to be reduced, the individual with the least seniority in that classification, rather than the individual with the least plant-wide seniority, was laid off. Consequently, it was possible for an employee on the Web press to continue to work while an individual with more years experience was laid off from Plateburning. This is what occurred, although not for the first time, to Marland Papillon on November 8, 1974.

Papillon began working at the East Stroudsburg plant on December 1, 1952 as an Assistant Pressman and has been a member of the Union since that time. By reason of a subsequent promotion his priority seniority date as a Journeyman Pressman became October 19, 1962. Because of a disagreement with the Union, which, however, was not translated into overt animosity between himself and Union officials, Papillon attended no meetings from 1968 until sometime shortly after his layoff in 1974.

In March, 1971, after the purchase of the plant by Hughes and the creation of the one-phase training restriction, Papillon indicated his desire to be trained on the Web press. Soon thereafter, he was offered the opportunity to train in the Plateburning department and accepted. His name was deleted from the Web list.

After he began his training program in the Plateburning department, additional pressmen with both more and less seniority than he began to train in that phase of the offset process.

Also, less senior individuals were assigned to the Web and sheet-fed presses. Despite the fact that he was aware that employees with less plant-wide seniority than he were being assigned to the other two phases of the offset process after he had commenced his training in Plateburning, Papillon never expressed a desire to rescind his decision to work in Plateburning in order to have an opportunity to train in the Web or sheet-fed process.

Not long after Papillon began training in the Plateburning department, an individual named Jack Beers began training there. Beers had initially chosen to be trained in the Sheet-fed phase of the offset process. This operation, which involves considerably more physical labor than Plateburning, proved too strenuous for Beers. Consequently, after only two or three weeks in that position, Beers, at his own request, was removed from that department and returned to his former position as a letter pressman. Approximately one year later, after all other employees in the plant had had an opportunity to be trained in one phase of the offset process, an opening arose in Plateburning. Every remaining employee then in the letter press department was asked to accept that position. All declined. Rather than hire a new employee, the Company, with the approval of the Union's general membership, offered the job to Beers. Beers began training in Plateburning and took the position immediately above Papillon on that department's seniority list. Beers himself was laid off on June 9, 1975.

Plateburning at the Hughes facility is, when fully operative, an eight-man operation. The department's roster on July 11, 1972, the date of the first layoff experienced by Papillon, was:

| NAME | SENIORITY DATE |
|---|---|
| Samuel Kupiszewski | November 28, 1942 |
| William Dildine | June 18, 1950 |
| Harold James | March 3, 1954 |
| Donald Clifton | April 30, 1954 |
| Harold Treibel | November 16, 1956 |
| Jack Beers | July 5, 1957 |
| Marland Papillon | October 19, 1962 |
| Jack Detrick | September 8, 1964 |

Subsequent to his initial layoff, Papillon, having the second lowest priority seniority within the Plateburning phase, was frequently laid off for short periods, sometimes amounting only to a day or two.

In July, 1972, Papillon refused to return to his job after one of these layoffs. He cited as grounds for his refusal to return the fact that employees who had been assigned to Plateburning after him but who had more seniority continued to work while he was laid off. He did not file a grievance. Because of his refusal to return to work Papillon was discharged.

Papillon sought reinstatement but was informed by the Company that he would be rehired only if he agreed to start as a "new" employee with a complete loss of seniority. Papillon reported this to the Union and a special Executive Board meeting was convened for the purpose of conferring with him regarding his discharge. The Board explained to him that the layoff procedures employed by the Company within the Plateburning department were consistent with the Union's agreement with Hughes.

At Papillon's request, Union officers interceded with the Company officials on his behalf. The Company agreed to reinstate Papillon with full seniority after the imposition of a short suspension. Papillon continued to complain informally to union officials concerning his "seniority rights". He also continued to experience short layoffs. However, prior to November 8, 1974, he filed no formal grievance with the Union nor did he attend any meetings at which he aired his dissatisfaction.

On November 8, 1974, as the result of a permanent company-wide cut-back of employees, Papillon and Jack Detrick were laid off from Plateburning. This action was in accord with the collective bargaining agreement which provided that " . . . employees within the lowest seniority standing in his (sic) classification shall be laid off first."

Sometime during the week between the announcement of this layoff and its effective date, Papillon was offered the position of Utilityman as well as several other non-offset process positions within the plant. Asserting that he would not "lower himself" to accept anything but a Pressman position, he declined. Other employees who accepted such positions earned an average of $10,287.28 during 1975 in comparison to an average of $12,184.42 made by Plateburners who continued to work.

On November 12, 1974, Papillon filed a grievance with the Union and, shortly thereafter, attended a Union meeting at which his grievance was read aloud without comment. Although he was not prohibited or prevented from doing so, Papillon made no attempt to explain the grievance to the general membership. At the conclusion of that meeting, Papillon attended a special meeting of the Union's Executive Board and the collective bargaining provisions concerning layoffs were again explicated to him. The Executive Board advised him that in its view there was no merit to his grievance. Papillon was advised that the general membership could, however, override the opinion of the Executive Board and it was suggested that he take the matter to the general membership for resolution.

Papillon's next action, however, was to file a formal appeal with the Union's international offices. While that complaint was pending, Papillon, through counsel, requested a meeting with the Union and the Company. At that meeting, the reasons for Papillon's discharge were reiterated.

On March 15, 1975, Papillon submitted the merits of his grievance to the general membership and was given every opportunity to propound his position. The Union President stated the Executive Board's opposition thereto. A secret ballot vote of the members in attendance was taken and Papillon's grievance was rejected. Because

this vote supported its view that Papillon's interpretation of his seniority rights was in direct contradiction to the explicit language of the collective bargaining agreement, the Union's Executive Board declined to submit his grievance to final and binding arbitration. Soon thereafter, Papillon's formal appeal to the International President of the Union was denied and he was informed that the decision to take a case to arbitration was one to be made by the general membership. This decision had already been reached adversely to him as a result of the vote on March 15, 1975.

The Court is of the view that no genuinely disputed issue of material fact exists and that the case should be decided on the motions for summary judgment. *Goodman v. Mead Johnson & Company*, 534 F.2d 566 (3d Cir. 4/2/76); *Sound Ship Building Corp. v. Bethlehem Steel Company*, 533 F.2d 96 (3d Cir. 1/16/76). Papillon has not set forth any specific facts showing that there is a genuine and material issue for trial. F.R. Civ.P. 56(e); *Jamison v. Miracle Mile Rambler, Inc.*, 536 F.2d 560 (3d Cir. 5/19/76).

■ There is no substantiation in the record of Papillon's charge that the Company violated the collective bargaining agreement and acted in collusion with the Union to deprive him of his rights thereunder. His layoffs, including the most recent one which is the genesis of this case, were all in strict accordance with the contract between the Union and the Company. The source of his dissatisfaction with his layoff is his own misunderstanding or refusal to accept that contract, rather than a demonstrable breach of it by the Company.

■ There is also no substantiation in the record of the charges against the Union. Initially, it is to be noted that before the Union's conduct can be called into question, it must be demonstrated that the employer has violated the collective bargaining agreement. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Papillon has failed to do this. However, even assuming *arguendo* that the Company's conduct amounted to a violation of contractual procedures, it is difficult to comprehend how

Papillon reaches the conclusion that the Union's conduct with respect to his grievance was "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes, supra*, at 190, 87 S.Ct. at 916. Nothing charged by Papillon amounts to the "substantial evidence of fraud, deceitful action, or dishonest conduct" which he must show in order to prevail. *Amalgamated Association of Street, Electric Railway and Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299, 91 S.Ct. 1909, 29 L.Ed.2d 473, 490 (1971). Even if Papillon could demonstrate the highly dubious proposition under this set of facts that the Union was negligent or demonstrated poor judgment with respect to his complaint, such proof would nevertheless be inadequate. *Bazarte v. United Transportation Union*, 429 F.2d 868, 872 (3d Cir. 1970). The Executive Board made extensive efforts to clarify the one-phase training clause to Papillon and did nothing to hinder his presentation of his grievance. The Board had the support of the general membership in all its actions. The only reason why the Union ended up in this lawsuit appears to be that it disagreed with Papillon about the legitimacy of his layoff.

The placement of Jack Beers in the Plate-burning department was not the subject of a grievance by Papillon at the time of its occurrence. Even if the treatment of Beers, although ratified by the general membership, constitutes technical noncompliance with the collective bargaining agreement, it is insufficient to support the charge that the Company violated the contract and the Union breached its duty of fair representation with respect to Papillon's layoff of November 8, 1974. Beers' situation hardly violates the one-phase re-training restriction. The two or three weeks spent by him in the Sheet-fed phase do not amount to "training" in that procedure.

The conclusion is inescapable that this case amounts to a desperate attempt by a disgruntled union member to overturn a valid collective bargaining agreement whose implementation has adversely affected him. It is not this Court's function to

undo labor agreements which are the product of bargaining between labor and management and which have been ratified by the Union's general membership.

An appropriate order will be entered.

### ORDER

1. The motion for summary judgment of the Hughes Printing Company in the above-captioned case is granted.

2. The motion for summary judgment of the Stroudsburg Printing Pressmen and Assistants' Union No. 350 is granted.

3. The Clerk of Court shall enter judgment in favor of Hughes Printing Company and the Stroudsburg Printing Pressmen and Assistants' Union No. 350.