590 F.2d 451
 100 L.R.R.M. (BNA) 2428, 85 Lab.Cas. P 11,021
 Donald RYAN, Richard Dunn, John de Sarle, Bernard Monahan,
George Hubert, Cornelius Cronin, Francis Butler,
Richard Hayes, Gary J. Mazzie, John
Longmore, and Frederick
Choffe, Appellants,
v.
NEW YORK NEWSPAPER PRINTING PRESSMEN'S UNION NO. 2, The New
York Times Company and New York News, Inc., Appellees.
 No. 58, Docket 78-7176.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 13, 1978.
Decided Jan. 8, 1979.
 
 Daniel S. Eisenberg, New York City, for appellants.
 Jerome P. Coleman, Townley & Updike, New York City, for appellees The New York Times Company and New York News, Inc.
 Michael M. Connery, Skadden, Arps, Slate, Meagher & Flom, New York City (John D. Feerick and Edward G. Imperatore, New York City, of counsel), for appellee New York Newspaper Printing Pressmen's Union No. 2.
 Before OAKES and VAN GRAAFEILAND, Circuit Judges, and MISHLER, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 Layoff problems caused by technological or economic contraction of work for a given trade union are some of the most difficult for employees, unions, employers, and courts alike. Those raised by the contraction/automation of the printing industry are no exception. Here, happily, New York metropolitan newspapers found positions for the employees of Alco-Gravure, Inc. (Alco), a Hoboken, New Jersey, plant that formerly printed the Sunday New York Times Magazine section. But, unhappily, there is a contest between some of Alco's laid-off employees on the one hand and other such employees and the Union on the other as to seniority (or "priority") in the new newspaper jobs. The contest, not resolved on the intra-union grievance level, takes the form of a suit against the Union for unfair representation and against it and the employers for breach of the collective bargaining agreement which, absent the Union's setting of the priorities here attacked, clearly would have given appellant employees priority "in the sequence of tenure of employment," that is, as first hired by the newspapers.[1] The United States District Court for the Southern District of New York, William C. Conner, Judge, on a stipulation of facts found no breach of the duty of fair representation and dismissed the complaint.[2] We affirm, although not without some question.
 
 FACTS
 
 2
 The Union appellee is a labor organization, a local of the International Printing & Graphic Communications Union, AFL-CIO (International), formerly the International Printing Pressmen & Assistants' Union of North America. The Union is the exclusive bargaining representative of appellants who are employees of appellee newspapers and formerly of Alco. Prior to February 1, 1975, Alco employed approximately 142 journeymen pressmen, members of the Union, including appellants. Soon thereafter, however, a series of layoffs occurred. On May 8, 1975, Alco notified twelve journeymen pressmen not appellants that they were to be laid off effective May 19, 1975.[3] Two days before the scheduled layoff, the president of the Union issued a "freeze order," the effect of which was to prohibit other Union members (including appellants) from seeking new jobs under the jurisdiction of the Union until each of the twelve employees to be laid off from Alco had obtained a new job and established seniority or priority in it. Between June 10 and 12, 1975, the Union permitted three journeymen pressmen again not appellants to resign from Alco and to obtain employment at the appellee newspapers and establish seniority and priority. And on June 15, 1975, Alco notified an additional twenty journeymen pressmen employees still not appellants that they were to be laid off effective June 23, 1975; the Union, through its president, responded by issuing a third similar freeze order.
 
 
 3
 With the employment situation deteriorating at Alco, on October 24, 1975, Alco issued a further notice to thirty-five journeymen pressmen employees, including all of the appellants herein. This notice was of a layoff effective November 3, 1975. Thus, under the terms of the contract, note 1 Supra, appellants automatically had lower priority in the New York newspaper shops than the previously laid-off Alco Union members who had already obtained New York newspaper employment. See note 3 Supra.
 
 
 4
 On October 28, 1975, the president of the Union issued another freeze order, a response to this last layoff notice. Unlike the previous freeze orders, however, which allowed the employees being laid off to establish a new priority at another shop without competition from other Union employees, including those remaining at Alco, the order allowed All employees, including those not yet laid off, to establish priority at another shop. Pursuant to this freeze order, all fifty-six journeymen pressmen remaining at Alco, although frozen in their shop affiliation unless Alco subsequently laid them off, would have priority over appellants at appellee newspapers if Alco later did lay off those remaining pressmen. In other words, having been prevented by the previous freeze orders from establishing New York newspaper priority superior to that of those with Lower Alco priority because the latter had been laid off from Alco and employed at the newspapers earlier than appellants, appellants were now to lose New York newspaper priority also to those with Higher Alco priority, even though the latter would necessarily be laid off later, or last, by Alco.
 
 
 5
 The remaining fifty-six journeymen pressmen did in fact remain employed at Alco after the appellants' layoff. Alco laid off seven of them on December 15, 1975. With the exception of five supervisory pressmen, Alco notified the remainder of a layoff effective December 22, 1975.[4] On April 13, 1976, Alco finally announced the permanent suspension of all printing operations at its Hoboken plant and the official termination of all pressmen employees previously laid off.
 
 
 6
 Intra-union grievance procedures and appeals[5] have failed to give appellants relief from the rather anomalous position in which they[6] find themselves: caught in the layoff squeeze at Alco by virtue of the two different freeze orders, their priority at appellee New York newspapers is lower than that of All of the other former Alco employees. Although from some date between November 1 (See note 6 Supra ) and December 22, 1975, appellants have all been employed at the New York newspapers, their priority is lower than that of previously laid-off Alco employees, who had lower priority at Alco but who were allowed to establish priority at the New York newspapers earlier than appellants, as well as later laid-off Alco employees who, because of their higher priority at Alco, under the freeze order obtained higher priority at the New York newspapers. Priorities are important not just in terms of layoffs but also in terms of work shifts.[7]THE LEGAL STANDARD OF FAIR REPRESENTATION
 
 
 7
 A union has a statutory duty of fair representation under § 8(b) of the Labor Management Relations Act,[8] a breach of which entitles the aggrieved employee(s) to relief in the courts at law as well as before the National Labor Relations Board. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).[9] In that leading case the Court circumscribed the duty, however, by stating that a breach occurs "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Id. at 190, 87 S.Ct. at 916. Not every breach resulting in unfairness, then, is remediable; it must have an additional element to it. Thus, for example, in the grievance context a union may not "arbitrarily ignore" a meritorious grievance or process it "perfunctor(ily)," but the employee does Not have "an absolute right to have his grievance taken to arbitration." Id. at 191, 87 S.Ct. at 917. "(A)rbitrary or bad-faith conduct," Id. at 193, 87 S.Ct. 903, or "substantial evidence of fraud, deceitful action or dishonest conduct," Humphrey v. Moore, 375 U.S. 335, 348, 84 S.Ct. 363, 371, 11 L.Ed.2d 370 (1964), is required to show a breach of the duty of fair representation. See Amalgamated Association of Street, Electric Railway & Motor Coach Employees v. Lockridge, 403 U.S. 274, 299, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).
 
 
 8
 This court has refined these concepts to stand for the proposition that, at least in negotiating and implementing a contract, a union may breach the statutory duty by arbitrary or irrational conduct, even in the absence of bad faith or hostility in the form of ill will or common law Malitia; but although the employee may challenge actions other than those involving anti-minority animus or malice, nevertheless "the union has broad discretion to adjust the demands of competing groups within its constituency as long as it does not act arbitrarily." Jones v. Trans World Airlines, Inc., 495 F.2d 790, 798 (2d Cir. 1974). We are not necessarily left with shifting ad hoc standards to be fashioned anew in each case, but we do have broad parameters of judgment that necessarily vary from context to context.
 
 
 9
 That context here is one of a declining employer in a declining field of employment, with a collective bargaining contract providing for the traditional last hired, first laid-off system but no real anticipation of the priority problems occurring when a stream of layoffs becomes a flood or when a vessel of employment taking on water suddenly begins to sink. This is essentially what occurred here, and the Union's attempt to plug the leak by using "freeze orders" would not seem to violate the standards of the cases set forth above.
 
 
 10
 Certainly a breach of the underlying agreement between the New York newspapers and the Union by the freeze orders would not alone constitute the kind of arbitrary or irrational action prohibited under the cases; this was an emergency situation not really envisaged in the collective bargaining agreements. It behooved the Union and its members to seek to keep Alco in business; and the Union could not do so if there were a rush of employees to the New York newspapers to obtain top priority there. The earlier freeze orders were clearly justified on this basis; the orders guaranteed priority to the early laid-off employees against the employees (including appellants) remaining at Alco, thus operating initially to prevent the employees not yet laid off from leaving Alco and then to reduce the incentive for them to leave. And the later October 28 freeze order gave the pressmen not laid off by Alco the right to obtain employment contingent upon the cessation of operations at the Alco Hoboken plant and on terms that reflected their priority there, again seeking to prevent their complete abandonment of Alco out of fear at this later date that Alco's closing was inevitable and that by remaining at Alco any longer they would suffer in relation to the pressmen already laid off and established elsewhere. The more exigent situation at Alco justified the more exigent response.
 
 
 11
 Appellants quarrel not only with the trial judge's seeming reliance on the Lockridge requirement of intentional and severe discrimination, See 403 U.S. 301, 91 S.Ct. 1909, but also the underlying Lockridge formulation requiring " 'fraud, deceitful action or dishonest conduct.' " Id. at 299, 91 S.Ct. at 1924 (quoting Humphrey v. Moore, supra, 375 U.S. at 348, 84 S.Ct. 363). Appellants suggest that the narrow import of this language has not been strictly followed in this circuit, See Jones v. Trans World Airlines, supra,[10] or in others, See, e. g., Beriault v. Local 40, Super Cargoes & Checkers of the International Longshoremen's & Warehousemen's Union, 501 F.2d 258, 263, 264 (9th Cir. 1974) (arbitrary conduct sufficient to constitute breach of duty by union, citing cases from Fourth, Fifth and Tenth Circuits).[11] But we think that Judge Conner was simply trying to examine the cases from higher courts, as he was duty bound to do; and, to the extent that the semantics that he found tended to be inconsistent, he simply gave them a deferential nod En passant and went on, quite properly, to examine the factual situation in this case. That context involved employees or groups of employees with different seniority in effect being transferred from one employer to another, a situation not present in the cases setting forth the language so difficult to reconcile. We cannot fault Judge Conner on his approach or result.[12]
 
 
 12
 It might be suggested, although appellants did not do so, that the Union should have provided the higher seniority pressmen left at Alco after appellants were laid off with priority at the New York newspapers greater than that of any other Union members whom the newspapers might hire but less than that of appellants. This allocation of priorities would have provided some protection to the employees left at Alco without prejudicing appellants. But conceivably this alternative would not have provided enough protection to the Alco employees with the greatest seniority, and there might have been a massive rush from Alco to the newspapers as soon as the Union president lifted the freeze order;[13] at least the president could have reasonably concluded as much. The ship would have sunk forthwith, giving the Union another series of administrative headaches, possibly including a lawsuit by Alco for failure to provide a work force and the consequent avoidance of Alco's carry-over obligations, whatever those might be. Under all of the circumstances in this shut-down context, we cannot say that the Union's imposition of the final freeze order was arbitrary, if that is the test as we think it is. The Union certainly did not act in bad faith it acted openly (and apparently with little contemporaneous objection);[14] with legitimate long-range objectives of employee security in a declining industry in mind; and without animus or ill will toward these appellants, with whose situation we sympathize but to whom the labor laws do not afford relief. The Union was trying to make the best out of a bad situation, and it was almost inevitable that the Union's drawing of a line would hurt someone. Although it is unfortunate that in this case the ultimate harm fell on appellants, drawing the line elsewhere would, or reasonably could have been thought would, have caused harm to others.
 
 
 13
 Judgment affirmed.
 
 
 
 *
 Chief Judge of the United States District Court for the Eastern District of New York sitting by designation
 
 
 [1]
 The appellee newspapers, The New York Times Co. and New York News, Inc., along with The New York Post Corp. which was a defendant below but as to which the case has been dismissed by stipulation, are parties to a collective bargaining agreement with appellee Union, New York Newspaper Printing Pressmen's Union No. 2. Section 5 of the collective bargaining agreement assigns hiring and discharge duties to an employer-designated foreman and provides, Inter alia:
 It is agreed, however, that in decreasing the force (the foreman) shall lay off the last man or men employed in his office, and in re-hiring journeymen and juniors they shall be selected in accordance with their priority standing in the office, provided that priority for extras shall apply only if they are available at the office at shape-up time. The Union shall supply and maintain in each office priority lists of journeymen arranged In the sequence of tenure of employment, provided that employees shall have priority rating in not more than one office.
 (Emphasis added.)
 
 
 [2]
 Jurisdiction lies under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a)
 
 
 [3]
 This layoff, as well as the subsequent layoffs at Alco, in accordance with the Alco collective bargaining agreement similar to the one in issue, See note 1 Supra, was in the Reverse order of priority in the Alco shop. Thus the last hired at Alco were the first laid off there but the first hired at the New York newspapers and hence under the collective bargaining contract entitled to higher priority at the newspapers than later hirees
 
 
 [4]
 Apparently two of the five journeymen pressmen whom Alco did not lay off in December, 1975, have established priority at The New York Times ahead of appellants. A third has since transferred out of defendant Union's jurisdiction to another Alco plant. A fourth is still employed at Alco and under the October 28, 1975, freeze order may at any time still establish priority at the New York newspapers ahead of appellants. The fifth employee has retired
 
 
 [5]
 On December 1, 1975, pursuant to the Constitution and Laws of the defendant Union, two appellants appealed to the Executive Committee of the Union to have their priorities established at the time of their terminations as had been done with the prior terminations at Alco. The Executive Committee of the Union upheld their appeal; but at the December 21, 1975, regular monthly meeting of the Union, the membership voted to reverse the decision of the Executive Committee and reaffirmed the freezing of priorities as the Union president had established them. Interested members on both sides of the priority question voted. These two appellants then appealed in writing to the president of the International, but he denied the appeal. They then appealed to the Board of Directors of the International who sustained the president's decision to deny the appeal. The two did not take their appeal to the International Convention held on September 13-17, 1976, in New York, N.Y., the last of the remedies within the Union provided by the Constitution and Laws of the Union and the International; but appellees do not base any argument against appellants because of their failure to pursue this final appeal other than to note that it was "inexplicable."
 
 
 [6]
 By virtue of the freeze order even those few employees hired at the New York newspapers between November 1 and 5, 1975, have no priority over December, 1975, laid-off employees whose freeze order date of newspaper priority is also November 6, 1975
 
 
 [7]
 Many employees at the newspapers are not assured in advance that they will receive five shifts of work per week. If an employee has not been notified in advance that he will be able to work a given shift, he must "shape up" to work that shift by either presenting himself physically at the place of employment or by awaiting a phone call, the different systems depending upon the employer. Through the Union's "Out-of-Work Rooms," he may also make himself available for work at employers at which he has not established priority
 
 
 [8]
 Section 8(b)(2), 29 U.S.C. § 158(b)(2) provides:
 It shall be an unfair labor practice for a labor organization or its agents
 to cause or attempt to cause an employer to discriminate against an employee in violation of (the protection against discrimination in hire or tenure) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership . . .
 
 
 [9]
 The Supreme Court recognized a statutory duty of fair representation over 20 years before Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), in railroad cases involving alleged racial discrimination, E. g., Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and extended the duty to unions certified by the National Labor Relations Board in Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). Some of the significance in the later cases, including Vaca v. Sipes, placed on "discrimination" undoubtedly derives from this background; not insignificantly Mr. Justice Harlan's language for the Court in Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971), speaks in this vein: "The duty of fair representation was judicially evolved, without the participation of the NLRB, to enforce fully the important principle that no individual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers."
 
 
 [10]
 See also Holodnak v. Avco Corp., Avco-Lycoming Div., Stratford, Conn., 381 F.Supp. 191 (D.Conn.1974) (Lumbard, J., sitting by designation), Aff'd in pertinent part, 514 F.2d 285 (2d Cir.), Cert. denied, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975)
 
 
 [11]
 See Sanderson v. Ford Motor Co., 483 F.2d 102, 110 (5th Cir. 1973); Woods v. North Am. Rockwell Corp., 480 F.2d 644, 648 (10th Cir. 1973); Griffin v. UAW, 469 F.2d 181, 183 (4th Cir. 1972)
 
 
 [12]
 It is a little difficult to tell exactly what standard Judge Conner applied below because he used the language of Vaca, supra, Lockridge, supra, Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), and Jones v. Trans World Airlines, 495 F.2d 790 (2d Cir. 1974), not all of which is consistent and some of which traces to the widespread, if discrete, problem of racial discrimination. See Note, The Duty of Fair Representation: A Theoretical Structure, 51 Tex.L.Rev. 1119 (1973). But Judge Conner properly looked to the framework of facts in this case
 
 
 [13]
 We note that the freeze order at issue here also differed from the earlier orders by freezing the pressmen remaining at Alco in their jobs indefinitely. This action was consistent with the attempt to maintain Alco operations if at all possible; but clearly the Union could not expect these pressmen to remain at Alco, on the sinking ship, so to speak, without compensating them in some way. The trade-off took the form of carry-over seniority without which the freeze order would severely have prejudiced those pressmen remaining at Alco. In fact, they would have been more seriously disadvantaged than appellants because those frozen at Alco would have had to give up even greater Alco seniority for even lower newspaper seniority
 
 
 [14]
 Of the 35 journeymen pressmen laid off when appellants were, only 20 joined as plaintiffs below; and only 11 appealed from the dismissal of the complaint. (The case against the New York Post Corp. has been dismissed by stipulation. See note 1, Supra.) Although the failure of the other pressmen to file suit or appeal is obviously not controlling upon appellants' right to do so, it does have a bearing on the reasonableness of the Union's conduct. Moreover, the Union membership voted to support the action of its president. Finally, appellants Ryan and Mazzie stated in depositions before trial that the president thought his actions might give the Union strength in negotiating with Alco; Mazzie agreed that Alco was exerting economic pressure in order to get a better contract and that the Union's action was "a show of unity, solidarity." Deposition of Donald Ryan at 30-31; Deposition of Gary J. Mazzie at 19-20