Lorenza D. LEWIS, Plaintiff,

v.

AMERICAN POSTAL WORKERS UNION, AFL–CIO, Defendant.

Civ. A. No. 79–0079–L.

United States District Court,
W.D. Virginia,
Lynchburg Division.

April 15, 1983.

---

Peter O. Ward, Jr., Lynchburg, Va., for plaintiff.

Patrick J. Riley, Arlington, Va., Darryle J. Anderson, O'Donnell & Schwartz, Washington, D.C., Alexander W. Bell, Lynchburg, Va., for defendant.

TURK, Chief Judge.

Plaintiff, who is employed by the United States Postal Service ("Postal Service") in Lynchburg, Virginia, instituted this action against the American Postal Workers Union, AFL–CIO ("APWU") and its vice president, alleging that the APWU breached its duty to fairly represent plaintiff in connection with the latter's grievance against the Postal Service. The action arises under 29 U.S.C. §§ 159(a) and 185. Jurisdiction is asserted under 29 U.S.C. § 185. The parties filed cross motions for summary judgment and filed legal memoranda in support of their respective positions. Oral argument was held on March 28, 1983. The court finds that the material facts are not genuinely in dispute, and that summary judgment is accordingly warranted at this juncture. Fed.R.Civ.P. 56(a).

By notice dated July 5, 1977, the Postal Service informed plaintiff that it intended to terminate him for habitual tardiness. On July 12, 1977, with the help of Donald Morrison, a shop steward for the APWU's local union ("local"), plaintiff wrote to the Postal Service, objecting to the proposed removal. Lewis Dep. at 10–11. On July 18, 1977, the Postal Service wrote to plaintiff, indicating that the charge was well founded, and that he would be terminated effective August 5, 1977.[1]

---

1. The letter notified plaintiff that he could appeal the action to the Civil Service Commission but, by doing so, he would waive the right to pursue his remedies past step 2B of the grievance procedure in effect between the Postal Service and the Union. Plaintiff did not appeal to the Civil Service Commission, on the advice of Robert Carr, the president of the local union. Lewis Dep. at 13. After consulting counsel, plaintiff did finally appeal to the Civil Service Commission, but the appeal was rejected as untimely. Plaintiff maintains that the untimeliness of this appeal resulted from the defendants' actions.

Morrison prosecuted the grievance to Step 1 of the grievance procedure.[2] This was denied by the employer. There is no evidence as to how union personnel conducted themselves during this step. Apparently, plaintiff did not attend any meeting, at this level. Lewis Dep. at 20. Morrison appealed to Step 2A,[3] but this was denied by the Postal Service on August 4, 1977. Again, the record contains no evidence as to how this step was conducted, and plaintiff did not apparently attend any meetings.

On August 15, Morrison appealed the grievance to Step 2B.[4] On August 17, 1977, a meeting was held, at which plaintiff gave his side of the story. Lewis Dep. at 31–32. (It is not clear, from the deposition, whether this meeting was held pursuant to the grievance procedure. Possibly, plaintiff was referring to a hearing before the Civil Service Commission and was confused as to the date.) By letter dated October 12, 1977, the Postal Service denied the August 15 appeal as untimely; it was also noted, however, that the grievance had been reviewed on its merits, and it would have been denied in any event. On October 20, 1977, the APWU National Arbitration Board notified Robert Carr, the local's president, that it had decided not to arbitrate the grievance because untimely appeals in the handling of grievances had generally been held to constitute "fatal procedural error." (The local was notified that it could, at its own expense, arbitrate the grievance. Obviously, this was never done.)

On November 10, 1978, plaintiff sued the Postal Service in this court, alleging that his discharge was unlawful.[5] *Lewis v. Bolger*, Civ. No. 78–0110–L. That case was dismissed pursuant to a settlement between the parties on January 25, 1979. Under the terms of the settlement, plaintiff was reinstated and given 45 days backpay. (Plain-

2. Step 1 provides: "The employee must discuss a grievance with his immediate supervisor within fourteen (14) days of when the employee or Union has learned or may reasonably have been expected to have learned of its cause. The employee may be accompanied by his steward or a Union representative, if he so desires. The supervisor shall render a decision, stating his reasons, within five (5) days. The Union shall be entitled to appeal an adverse decision to Step 2 of the grievance procedure within ten (10) days after receipt of the Employer's decision. Such appeal shall be in writing to the head of the installation or his designee.

"The Union may also initiate a grievance at Step 1 in accordance with the above, and may initiate a class grievance at Step 1 when the grievance concerns the complaint of more than one employee in the office."

3. Step 2A provides: "The employee shall be represented by a steward or a Union representative. The installation head or his designee will meet with the steward or Union representative as expeditiously as possible, but no later than seven (7) days after receipt of the appeal. A decision by the Employer shall be rendered within ten (10) days after it has been appealed to Step 2A. Such decision shall be in writing and the Union shall be entitled to an oral explanation of the reasons therefor. The Union shall be entitled to appeal an adverse decision to Step 3 of the grievance procedure within ten (10) days after receipt of the Employer's decision, except for the subjects specified in Step 2B."

4. Step 2B provides: "In the absence of settlement through Step 2A, grievance involving the subject of disciplinary action taken against an employee or the discharge of an employee may not be submitted to Step 3 or 4, but may be appealed in writing to the Regional Director for Employee and Labor Relations within ten (10) days after receipt of the Employer's 2A decision. The Regional Director for Employee and Labor Relations shall provide a hearing at a management level higher than the installation level and a location convenient to the parties. The management representative at Step 2B shall be a person who has had no direct connection with the case and such person shall be at a higher level than the Employer's Step 2A representative. The employee may be represented by an area or regional Union representative, and the Employer's decision shall be rendered within seven (7) days after the grievance has been appealed to this Step. Such decision shall be in writing stating the reasons therefor. If there is no settlement at this Step, the Union shall be entitled to refer the grievance direct to arbitration within twenty-one (21) days, and in accordance with the arbitration procedure."

5. Plaintiff also apparently instituted proceedings under Equal Employment Opportunity laws, but these were also denied as untimely. (These proceedings may be the same as those, referred to in note 1, *supra*, before the Civil Service Commission.)

tiff suggests that his claims against the Postal Service were vindicated by the settlement, but no formal adjudication to that effect was ever rendered.)

Subsequently, on August 7, 1979, plaintiff instituted the present suit against the APWU, alleging that the union breached its duty of fair representation in the handling of the grievance, and that the settlement with the Postal Service did not adequately compensate him.

According to plaintiff, he got along well with Morrison, and the two knew each other socially. Lewis Dep. at 23. However, Morrison was relatively new at the shop steward position, and was not knowledgeable about the grievance procedure. *Id.* at 34, 38. He does not believe Morrison intentionally filed the appeal to Step 2B late; had the latter been better informed the grievance would have been timely filed. *Id.* at 38.

However, plaintiff's dealings with President Carr, were on a less amicable basis. They "did not get along." *Id.* at 39. It was "a personal thing." *Id.* Plaintiff is not sure when the animosity first developed; it may have been prior to May 1977. *Id.* at 45–46. Different employees, who plaintiff could not identify, suggested to him that Carr had something to do with the untimeliness of the filing. *Id.* at 39–40. Carr was "in and out of the picture" with respect to the prosecution of the grievance, because Morrison was new and did not know all of the procedures to be followed. *Id.* at 18. These employees told plaintiff that Carr "didn't like" him; that Carr did not care whether he "got [plaintiff] out," or whether plaintiff was "kept on as an employee" or whether he "got fired or not." *Id.* at 40. Carr, as president of the local, should have kept abreast of the developments with regard to his union and he failed to do so. *Id.* at 42. Carr "should have had closer supervision of Morrison's work." *Id.* at 43. Carr "took care of who he wanted to take care of. [I]f he had personal conflict or if he didn't like you he wouldn't pursue the case." *Id.* at 43. The union has "a history of not following up or not doing the job they are supposed to do." *Id.*

Further, Carr represented plaintiff in connection with an earlier suspension which, in part, formed the basis for plaintiff's termination. *Id.* at 40. Plaintiff was not happy with this handling of the grievance, in that the union "dragged it out." *Id.* at 43. During that grievance, the union met all of the applicable deadlines, *id.* at 45, but Carr did not give plaintiff "the impression that he really wanted to handle the case." *Id.* Carr was not "enthusiastic," but just "did the job." *Id.*

 A union must treat all segments of its membership without hostility or discrimination, and with complete good faith and honesty. The union must avoid arbitrary conduct toward its members. *Griffin v. International Union, U.A.W.,* 469 F.2d 181, 183 (4th Cir.1972). *Accord, Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 891 (4th Cir.1980). Gross indifference can constitute arbitrariness. *Wyatt,* 623 F.2d at 891. However, simple negligence in the handling of a grievance is insufficient to give rise to a claim of a breach of the duty of fair representation. *Id. Accord, DelCostello v. International Brotherhood of Teamsters,* 510 F.Supp. 716, 721 (D.Md. 1981). "In the final analysis the right of an individual employee to have his grievance processed depends on the provision of the applicable collective bargaining agreement and the facts of each case." *Wyatt,* 623 F.2d at 891.

 Defendants contend that the mere failure of Morrison to timely appeal the denial at Step 2A constituted "negligence" of the purest type, and that this action must be dismissed on the strength of *Wyatt.* Plaintiff makes two rejoinders. First, plaintiff maintains that the overall handling of this grievance, especially as manifested by Carr's personal animosity toward him, and Carr's failure to monitor Morrison's handling of the grievance, was perfunctory, and that the untimely filing of the appeal was but one result—albeit the most dramatic one—of that perfunctoriness. Second, he maintains that the "negligence" for which an action may not be maintained

is only that involving acts of discretion by union officials. This negligent act was purely ministerial, and in effect amounted to the sort of arbitrary or perfunctory behavior that *is* actionable. The court will address each of these contentions in turn.

In his memorandum plaintiff asserts baldly, without amplification, that "evidence at trial will show arbitrariness, discrimination, or bad faith in the union's handling of Lewis' case." *See* argument heading I.A. Plaintiff provided no affidavits in support of this contention and, accordingly, it can only be evaluated in light of the available documentation and plaintiff's deposition.

The documents reveal only that Morrison actively pursued the grievance until he filed an untimely appeal. The local still sought arbitration at the national level, and only when this was denied did the handling of the grievance end. Of course, the fact that certain procedural steps were complied with says nothing about the quality of the representation at those stages. Plaintiff says only that he "discussed" his grievance with Morrison; he does not say how extensively they discussed it. Further, it appears that at least two meetings were held between union and Postal Service officials, but no evidence indicates how well the union presented plaintiff's case at these meetings.

Plaintiff alleges broadly and vaguely that he thought Carr did not like him, and that this dislike somehow carried over into the handling of plaintiff's grievance. Presumably, he contends that, if Carr had nothing against him, the union president would have taken a more personal interest and role in the prosecution of the grievance. Plaintiff alleges in vague terms that Carr would only "pursue" the cases of those he liked.

The court concludes that plaintiff has utterly failed to identify any basis for finding a causal connection between Carr's supposed dislike of him and the way Morrison handled his grievance. All indications, aside from plaintiff's vague and conclusory allegations, are that Morrison, who was primarily responsible for handling the griev-ance, Lewis Dep. at 43, pursued the grievance to Step 2B of the procedure, when he inadvertently filed a late appeal. In some situations, certainly, a union president's predilections could cause the union to breach its duty of fair representation if those feelings lead to the arbitrary treatment of those he dislikes in favor of those he likes. Plaintiff's insinuations and suspicions constitute the sole evidence of that in this case. These are insufficient to defeat the defendant's motion for summary judgment. The case has been on the docket for nearly four years, and plaintiff has not come forth with any evidence to support his bare allegations as to this point. Accordingly, the defendants' motion for summary judgment will be granted as to this theory of plaintiff's case.

Plaintiff also maintains that the late filing of his appeal, independent of any general perfunctoriness or arbitrariness, is actionable. He relies primarily on *Dutrisac v. Caterpillar Tractor Co.,* 511 F.Supp. 719 (N.D.Cal.1981) to support this contention. The facts in that case were almost identical to those in this one: a union steward took a terminated employee's grievance to the third step and then, negligently, failed to timely file a request for mandatory binding arbitration. The court noted that resolution of the term "arbitrary," as set forth in *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967), had not always been very satisfactory. After a review of relevant authorities, the court concluded

> that in the case of a terminated employee, the failure to comply with a time limit which is clear on its face, where a determination has been made that an employee grievance has some merit, and where the missing of the time limit has the effect of depriving an employee of the mandatory grievance procedures provided by the collective bargaining agreement between an employer and a union, is arbitrary conduct constituting a breach of the duty of fair representation, and no matter how innocently the time limit was missed, such conduct cannot constitute "mere" negligence.

511 F.Supp. at 727. The court found that, consistent with precedent in the Ninth Circuit, the conduct represented a "reckless disregard" for the employee's rights, and caused severe prejudice to him. Moreover, the policies underlying the duty of fair representation would be best served by requiring unions to observe critical time limits. Conversely, no countervailing policies existed in favor of limiting union liability in such instances. *Id.*

This analysis is supported by compelling reasons. The distinction that plaintiff seeks to make finds an apt parallel in the law of governmental tort liability. It is a familiar principal that government units are generally held responsible for negligence in the performance of ministerial, but not discretionary, duties. Strong policy reasons favor the immunization of governmental officials from suit for negligence exercise of their discretion, but these policy reasons are not as strong when no discretion is involved. By analogy, the same policies may apply to union officials.

Defendants counter primarily with the case of *Hoffman v. Lanza, Inc.,* 658 F.2d 519 (7th Cir.1981). That case held, on essentially identical facts, that no breach of the duty of fair representation had occurred. After reviewing mainly *Ruzicka v. General Motors Corp.,* 523 F.2d 306 (1975) (*Ruzicka I*) and *Ruzicka v. General Motors,* 649 F.2d 1207 (6th Cir.1981) (*Ruzicka II*), which *Dutrisac* also reviewed, the court reached its decision. First, the court considered *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), where the Supreme Court noted the distinction to be made between "honest, mistaken conduct, on the one hand, and deliberate and severely hostile and irrational treatment, on the other," 403 U.S. at 301, 91 S.Ct. at 1925, when an employee challenged the result of grievance and arbitration proceedings. Second, the court identified the opportunity for collusion between unions and their members; since the ultimate relief sought is reinstatement and backpay, the union defendant will "have little reason to vigorously contest the issue of alleged union wrongdoing." 658

F.2d at 522. (The court's rationale with regard to this point is not precisely clear, and may have little validity after *Bowen v. United States Postal Service,* —— U.S. ——, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983), where it was held that a union is liable for the share of the damages resulting from its breach.) The *Hoffman* court thus appears to require that, for union behavior to be "arbitrary," it must be in some manner purposive and hostile to the employee. Under this rationale, plaintiff could not recover.

In *Lockridge,* the case primarily relied on by the court in *Hoffman,* the Supreme Court, in discussing the preemption doctrine, stated the following:

> The duty of fair representation was judicially evolved, without the participation of the NLRB, to enforce fully the important principle that no individual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers. Where such union conduct is proved it is clear, beyond doubt, that the conduct could not be otherwise regulated by the substantive federal law. And the fact that the doctrine was originally developed and applied by courts, after passage of the Act, and carried with it the need to adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives ensures that the risk of conflict with the general congressional policy favoring expert, centralized administration, and remedial action is tolerably slight. * * *. So viewed, the duty of fair representation, properly defined, operates to limit the scope of [*San Diego Building Trades Council v.*] *Garmon* [359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)] where the sheer logic of the preemption principle might otherwise cause it to be extended to a point where its operation might be unjust. * * *. If, however, the congressional policies *Garmon* seeks to promote are not to be swallowed up, the very distinction, embedded within the instant lawsuit itself, between honest, mistaken conduct, on the one hand, and deliberate

and severely hostile and irrational treatment, on the other, needs strictly to be maintained.

403 U.S. at 301, 91 S.Ct. at 1925.

In *Hines v. Anchor Motor Freight,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), several employees were terminated for alleged dishonesty in claiming reimbursement for travel expenses. They urged their union representatives to investigate a motel, where they had stayed, and the union assured them that they had "nothing to worry about." Their grievances were ultimately denied. Later, it was discovered that a motel employee, not the plaintiffs, was responsible for the dishonest conduct with which they had been charged. The plaintiffs sued their employer and the union, alleging that the latter had breached its duty of fair representation by failing to investigate the charges or make any attempt to ascertain the truth thereof. The court said that Congress intended "that the contractual machinery [should] operate within some minimum levels of integrity," 424 U.S. at 571, 96 S.Ct. at 1059, and that, if the plaintiffs proved their case, they would be entitled to relitigate the validity of their discharges. The Court reaffirmed its statement in *Vaca* " 'that a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion ...,' " 424 U.S. at 568–69, 96 S.Ct. at 1058, *quoting from Vaca v. Sipes,* 386 U.S. 171, 191, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967).

The most applicable case in this Circuit is *Griffin, supra.* In that case, Griffin got into a fight with a management official, and he was discharged. The union filed Griffin's grievance with the same management official. The court held that this evidence supported a jury verdict finding the conduct to be arbitrary or perfunctory. The court stated, in setting forth general principles:

A union may refuse to process a grievance or handle the grievance in a particular manner for a multitude of reasons, but it may not do so without reason, merely at the whim of someone exercising union authority. A union must especially avoid capricious and arbitrary behavior in the handling of a grievance based on a discharge—the industrial equivalent of capital punishment.

469 F.2d at 183.

As the court noted in *Dutrisac,* the attempts to define the standard of care owed to union members by their unions have not always been uniform. *See* Note, *The Duty of Fair Representation in Grievance Administration: A Specific Test Modeled on Judge Bazelon's Dissent in United States v. Decoster,* 39 WASH. & LEE L.REV. 185 (1982). For examples of similar cases, in addition to those already noted, *see Ethier v. United States Postal Service,* 590 F.2d 733 (8th Cir.) (union not liable when steward filed grievance one day too late due to misunderstanding of time requirement), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *Foust v. International Brotherhood of Electrical Workers,* 572 F.2d 710, 714–16 (10th Cir.1978) (evidence would support jury finding that untimely filing of grievance was "arbitrary, unreasonable and a breach of duty." 572 F.2d at 716), *reversed on other ground,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); *Coe v. United Rubber, Cork, Linoleum and Plastic Workers of America,* 571 F.2d 1349, 1350–51 (5th Cir. 1978) (careless or inadvertent misnumbering of employee's grievance by union, affording employer defense of untimeliness, held not "arbitrary"); *Schum v. South Buffalo Railway Co.,* 496 F.2d 328 (2d Cir.1974) (union breached duty of fair representation when, through "lack of diligence," it allowed time period for filing appeal to second step of grievance procedure to lapse); *Baker v. Unit Parts Co.,* 487 F.Supp. 1313, 1315 (W.D.Okl.1980) (union breached duty by its "total failure to act" after being apprised by employee of existence of grievance); *Ruggirello v. Ford Motor Co.,* 411 F.Supp. 758, 760–61 (E.D.Mich.1976) (union breached duty when it never instituted formal grievance on employee's behalf, relying instead on informal adjustment methods, and grievance was ultimately rejected as being untimely).

**1148**

The court concludes, after having reviewed the foregoing authorities, that some degree of conscious misfeasance or dereliction is contemplated by the "arbitrary" standard as set forth in *Vaca*. Thus, the courts' reluctance to find liability for purely negligent acts results from the attempt to implement this distinction. The other two elements of *Vaca* —bad faith and discrimination—clearly contemplate distasteful action of the type noted before unions may be held liable. "Arbitrary" or "perfunctory" treatment of grievances may also be condemned on such grounds, when it rests on indifference or slovenliness—in short, when the union has completely abdicated its responsibilities to union members. Thus, when a shop steward misses a deadline because he just does not care, his union may be liable for breaching the duty of fair representation. Negligent handling of a grievance, however, when it results not from a total lack of interest therein, but from an honest mistake or carelessness, is not actionable. Like the negligent tortfeasor in any other area of negligence law, the negligent shop steward has not committed a wrong of the sort contemplated by *Vaca*.

Applying these principles to this case, the court concludes that Morrison's failure to file the grievance resulted not from indifference or slovenliness, but from honest mistake or carelessness. Plaintiff, when deposed, testified as to no facts which would suggest otherwise. In fact, as the court already has noted, plaintiff testified at his deposition that he and Morrison were on good terms, and that the latter missed the deadline only because, at worst, he was unfamiliar with the grievance procedure. Further, the court has already held that no evidence supports plaintiff's contention that the grievance was handled against a general backdrop of perfunctoriness.

Based on the foregoing, defendants' motion for summary judgment will be granted, and plaintiff's denied, in an appropriate order. In light of this conclusion there is no need to address the parties' remaining contentions.